Maria JUHL, Breck Landry, Martha Arellano, Richard D. Weiss, Betty F. Jameson, Grace Madrid, Barbara Shepard Baldwin f/k/a Barbara Licht Shepard and Shirley Riordan, Petitioners,

v.

Thomas AIRINGTON, Respondent.

No. 94–0989.

Supreme Court of Texas.

Argued Sept. 5, 1995.

Decided June 28, 1996.

Rehearing Overruled Jan. 31, 1997.

Cynthia S. Anderson, Monty Kimball, H. Keith Myers, Mary W. Craig, Patrick Groves, Larry W. Hicks, El Paso and Elizabeth German, Albuquerque, NM, for Petitioners.

C. Jeff Minor, Gordon Stewart, El Paso, for Respondent.

PHILLIPS, Chief Justice, delivered the opinion of the Court in which HECHT, CORNYN, ENOCH, SPECTOR, OWEN and BAKER, Justices, joined.

A police officer brought this suit against a dozen protesters for an injury he allegedly sustained to his back while trying to remove one of their group from an abortion clinic. The officer claimed that the negligence of each defendant proximately caused his back injury. The trial court granted summary judgment for ten of the twelve defendants and granted a severance to make the judgment final. The court of appeals reversed and remanded for trial on the merits. 883 S.W.2d 286. We conclude that there is no theory under which any of the participants before us may be held liable for an injury sustained by an officer in removing another demonstrator. Accordingly, we reverse the judgment of the court of appeals and render judgment that plaintiff take nothing.

I

On September 16, 1989, a group of demonstrators attempted to block access to the Reproductive Services Clinic in El Paso. Individual demonstrators testified that they intended to disrupt the clinic's activities for as long as possible by placing themselves in front of the clinic's doors. Police officers called to the scene, including Officer Thomas Airington, ordered the demonstrators to leave the premises. Some refused to cooperate, forcing the officers to arrest them and literally carry them away. Officer Airington claims that he injured his back when he and another officer attempted to remove protestor Sylvia Salazar. In addition to Salazar, Airington also sued Samuel Oppenheim, the protest organizer, and protestors Maria Juhl, Breck Landry, Martha Arellano, Richard D. Weiss, Betty F. Jameson, Grace Madrid, Barbara Shepard Baldwin, Shirley Riordan, James Gose and Aileen Gose. Airington alleged that each defendant was negligent in:

associating and acting together for the purpose of creating a disruption of a legal business which they knew or should have known would lead to a confrontation with police and others; creating a situation which they knew or should have known would create a danger of injury to officers who had to physically remove the protestors; participating in planning or agreeing to the demonstration; failing to obey a lawful order and leave the premises; and failing to assist the police in removing Salazar and themselves from the site.

Following discovery, all defendants except Salazar and Oppenheim moved for summary judgment. They argued that they had no duty to prevent Salazar from injuring Airington, that their actions or inactions were not a proximate cause of Airington's injury, and that no defendant exercised control over any other demonstrator.[1]

Taking the record in the light most favorable to the non-movant, the summary judgment evidence reveals that most protesters learned about the demonstration by word of mouth no more than two days in advance. Nevertheless, three to four hundred potential protesters gathered at Alive Ministries Church on the night before the protest. During this meeting, the possibility of arrest was discussed. Oppenheim suggested that "assuming a limp position would identify with limp, dead babies, with helpless babies, perhaps in the womb," and that doing so would also "give us more time to accomplish our purpose which was saving babies and mothers from abortion." The morning of the demonstration, the protesters again met at the church. Oppenheim and others (no one could remember who) advised them where to go, what to do when they got to the clinic, and how to respond passively if confronted by police. It was left to each individual, however, to decide whether to obey a police order to leave or to disobey and risk arrest, and if the latter, whether to cooperate with the arresting officer or to passively resist removal. Many of the protestors rode to-

---

1. One defendant also asserted that the common law "fireman's rule" barred Airington from recovering for any injury sustained in the course of his duties. Because we dispose of this case on other grounds, we need not consider this theory.

gether to the clinic in vans or buses that were provided for them. There is some evidence that the protestors understood that those who rode in the vans had decided to enter onto the clinic grounds, refuse to leave, and subject themselves to arrest.

The trial court granted the summary judgment, severing the remaining actions against Salazar and Oppenheim to make the judgment final and appealable. The court of appeals reversed, holding that defendants had conclusively disproved neither duty nor causation.

## II

The court of appeals held that fact issues remained both "as to the status of the group ... as an unincorporated association" and "as to whether [defendants] were acting in concert with each other and with Oppenheim and Salazar." 883 S.W.2d at 290. The court identified the central issue to be whether defendants constituted an unincorporated association, as there would be "potential individual tort liability of members of such an association for the negligence of other members or the negligence of· the association itself." 883 S.W.2d at 288. The court reasoned that if the defendants were an unincorporated association, they could be directly liable for "one member of [this] unincorporated association act[ing] in concert with other members," and because defendants owed Airington a duty "to not set the proceedings leading to the injurious conduct in motion and a duty to not agree and act in concert with the actual tortfeasor." 883 S.W.2d at 290.

▮ While recognizing that "no Texas cases have specifically held that a member of such an association may be liable for the tortious act of another member," the court relied on *Cox v. Thee Evergreen Church,* 836 S.W.2d 167 (Tex.1992), and several court of appeals cases interpreting *Cox,* as "suggest[ing] that such liability may in fact be imposed." 883 S.W.2d at 288. Actually, *Cox* held only that a member of an unincorporated association could sue the association. *Cox,* 836 S.W.2d at 173. *Cox* may in fact reasonably be read as precluding group liability for one member's conduct. In abrogat-

ing the common law rule that a member cannot sue the group because the group's negligence is imputed to the member, the Court necessarily concluded that membership no longer automatically carries with it legal responsibility for the group's actions. As Justice Cook, joined by Justice Hecht, noted in a concurring opinion:

> The implicit holding of today's opinion is that the individual liability of a member will be based on their actual participation in the tort or ratification of the actions which cause injury. Accordingly, I do not believe that an injured member should be able to recover for their injuries from another member who did not participate in or ratify the conduct leading to the member's injury.

*Cox,* 836 S.W.2d at 174. Thus, even if the demonstrators constituted an unincorporated association, we have never held that they are automatically liable for the actions of other members of the association.

Further, imposing liability on individuals on the sole basis that a member of a group to which they belong has committed a tort in pursuit of the group's goals would pose serious threats to the right of free association. As the United States Supreme Court recognized in *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 931–32, 102 S.Ct. 3409, 3435–36, 73 L.Ed.2d 1215 (1982), where it refused to allow the national organization to be liable for the actions of some members of a local chapter unless it had authorized or ratified the unlawful conduct, "[t]he rights of political association are fragile enough without ... the additional threat of destruction by lawsuit." Nor did the Court allow individual members to be held liable for mere membership in the local chapter absent proof of "a specific intent to further an unlawful aim embraced by the group." *Id.* at 925, 102 S.Ct. at 3432. The Court reasoned that this would amount to a constitutionally impermissible "guilt by association." *Id.*

Our sister court has refused to impose criminal liability because of similar concerns for the right of free association protected under article I, section 27 of the Texas Constitution. In discussing the mental state nec-

essary to convict a defendant under an anti-riot statute, the Court of Criminal Appeals recognized that:

> Read literally, the riot statute criminalizes a knowing participation in an initially peaceable assembly that subsequently results in conduct creating an immediate danger of damage to property or injury to persons. If this language is not construed to require that the defendant participate in said assembly after gaining knowledge of the inception of such conduct, the statute would constitute a clear abridgement of the right of peaceable assembly.

*Ferguson v. State,* 610 S.W.2d 468, 470 (Tex. Crim.App.1979). Therefore, the Court reversed the conviction, which was based on a jury charge that did not properly instruct the jury on the knowledge necessary for guilt.

We believe that the liability of members of a group should be analyzed in terms of the specific actions undertaken, authorized or ratified by those members. Therefore, regardless of whether there was an unincorporated association here,[2] we reject the lower court's intimation that the existence of such an association might alone form the basis for imposing tort liability on all members for the acts of some.

### III

Airington also asserts that the summary judgment should have been reversed because there is a fact issue whether defendants are liable for Airington's injuries under the so-called "concert of action" theory. A version of the theory has been articulated by Prosser and Keeton as follows:

> All those who, in pursuance of a common plan or design to commit a tortious act, actively take part in it, or further it by cooperation or request, or who lend aid or encouragement to the wrongdoer, or ratify and adopt the wrongdoer's acts done for their benefit, are equally liable.

W. PAGE KEETON, ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 46, at 323 (5th ed.

1984) (Hereinafter PROSSER & KEETON ON TORTS). The Restatement also incorporates this principle, imposing liability on a person for the conduct of another which causes harm if the defendant:

> (a) does a tortious act in concert with the other or pursuant to a common design with him, or
>
> (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or
>
> (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

RESTATEMENT (SECOND) OF TORTS § 876 (1977) (hereinafter RESTATEMENT § 876)

The court of appeals looked to this Court's decision in *Gaulding v. Celotex Corp.,* 772 S.W.2d 66, 69 (Tex.1989), for support in concluding that defendants could be liable for "setting the proceedings leading to the injurious conduct in motion or agreeing and acting in concert with the actual tortfeasor." 883 S.W.2d at 290. However, far from holding that a cause of action could be maintained under the concert of action theory, *Gaulding* refused to apply it in that case and expressly declined to approve this theory of liability. *Gaulding,* 772 S.W.2d at 71 ("We are not to be construed as approving or disapproving ... concert of action ... in an appropriate case."). Thus, whether such a theory of liability is recognized in Texas is an open question.

 Subsection (a) of Restatement (Second) section 876 requires at least a tacit agreement to participate in some tortious act, done in furtherance of a common goal or plan, and which causes injury. *Halberstam v. Welch,* 705 F.2d 472, 477 (D.C.Cir.1982); *Payton v. Abbott Labs,* 512 F.Supp. 1031, 1035 (D.Mass.1981); PROSSER & KEETON ON TORTS § 46, at 323 & n. 8–11. This has

---

**2.** Though we do not need to decide the issue, it is doubtful that this group of protestors can be considered an unincorporated association. Oppenheim, who was the organizing force behind the demonstration, operated his abortion activi-

ties as a sole proprietorship called Rescue El Paso. It had no newsletter, no charter, no membership, no formal organization, and no regular meetings.

common elements with common law civil conspiracy, long a recognized tort in this state. *See Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W.2d 854, 856 (Tex.1968); *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex.1983) ("The essential elements [of civil conspiracy] are: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result."). We, however, have recently held that merely proving a joint "intent to engage in the conduct that resulted in the injury" is not sufficient to establish a cause of action for civil conspiracy. *Triplex Communications, Inc. v. Riley*, 900 S.W.2d 716, 719 (Tex.1995). Instead, "civil conspiracy requires specific intent" to agree "to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means." *Id.* Because negligence by definition is not an intentional wrong, one cannot agree or conspire to be negligent. Therefore in *Triplex*, we held that a finding that the parties "intended to accomplish an unlawful or negligent purpose or to accomplish a lawful purpose by unlawful or negligent means" would not support liability. *Id.* at 720. Consistent with our decisions in *Triplex*, 900 S.W.2d at 719, and *Firestone Steel Prods. Co. v. Barajas*, 927 S.W.2d 608, 617 (Tex.1996), if we were to adopt § 876(a) we would require allegations of specific intent, or perhaps at least gross negligence, to state a cause of action. Because Airington's pleadings allege only that defendants were negligent, civil conspiracy and § 876(a) are not theories upon which he could have relied to support summary judgment.

On the other hand, subsection (b) of Restatement (Second) section 876 imposes liability not for an agreement, but for substantially assisting and encouraging a wrongdoer in a tortious act. This subsection requires that the defendant have "an unlawful intent, i.e., knowledge that the other party is breaching a duty and the intent to assist that party's actions." *Payton v. Abbott Labs*, 512 F.Supp. 1031, 1035 (D.Mass.1981). Many jurisdictions have recognized liability in at least some circumstances for such substantial assistance, though not all have formally adopted subsection (b). *See Cobb v. Indian Springs, Inc.*, 258 Ark. 9, 522 S.W.2d 383, 387 (1975); *Carney v. DeWees*, 136 Conn. 256, 70 A.2d 142, 146 (1949); *Bierczynski v. Rogers*, 239 A.2d 218, 221 (Del.1968); *Smith v. Thompson*, 103 Idaho 909, 911, 655 P.2d 116, 118 (App.1982); *Farmer v. City of Newport*, 748 S.W.2d 162, 164 (Ky.Ct.App.1988); *Haddock v. Stewart*, 232 Md. 139, 192 A.2d 105, 107 (1963); *Nelson v. Nason*, 343 Mass. 220, 177 N.E.2d 887, 888 (1961); *Sloan v. Fauque*, 239 Mont. 383, 784 P.2d 895, 896 (1989); *Boykin v. Bennett*, 253 N.C. 725, 118 S.E.2d 12, 16 (1961); *Rael v. Cadena*, 93 N.M. 684, 604 P.2d 822, 822–23 (App.1979); *Kuhn v. Bader*, 89 Ohio App. 203, 101 N.E.2d 322, 327 (1951); *Sprinkle v. Lemley*, 243 Or. 521, 414 P.2d 797, 800 (1966); *Solberg v. Johnson*, 90 Or.App. 90, 750 P.2d 1190, 1192 (1988); *Cecil v. Hardin*, 575 S.W.2d 268, 272 (Tenn.1978); *Price v. Halstead*, 177 W.Va. 592, 355 S.E.2d 380, 386 (1987); *Collins v. Eli Lilly Co.*, 116 Wis.2d 166, 342 N.W.2d 37, 46 (1984).

■ Even if we were to adopt subsection (b) of Restatement (Second) section 876 in Texas, Airington could not recover under its terms. Specifically, the defendants did not provide Salazar the substantial assistance necessary for liability. Comment d of section 876 lists five factors which can be relevant to whether the defendant substantially assisted the wrongdoer. These include: 1) the nature of the wrongful act; 2) the kind and amount of the assistance; 3) the relation of the defendant and the actor; 4) the presence or absence of the defendant at the occurrence of the wrongful act; and 5) the defendant's state of mind. RESTATEMENT (SECOND) § 876 cmt d. Except for the "presence or absence at the occurrence," all of these factors would cut against liability in this case.

■ The purpose of the concert of action theory is to deter antisocial or dangerous behavior. *Lyons v. Premo Pharmaceutical Labs, Inc.*, 170 N.J.Super. 183, 406 A.2d 185, 190 (1979); *Abel v. Eli Lilly & Co.*, 418 Mich. 311, 343 N.W.2d 164, 176 (1984); Comment, *The DES Dilemma: A Study in How Hard Cases Make Bad Law*, 59 U.CIN.L.REV. 489, 495 (1990); Gregory C. Sisk, *Interpretation*

of the Statutory Modification of Joint & Several Liability: Resisting the Deconstruction of Tort Reform, 16 U.Puget Sound L.Rev. 1, 108 (1992) ("concerted activity cases generally involve such manifestly unacceptable and dangerous behavior as group assault upon an individual or highway drag-racing . . ."). Thus, as we noted in Gaulding, 772 S.W.2d at 69, section 876(b) has often been employed to hold all parties who drag race on public streets liable if only one vehicle actually causes injury to a bystander. See, e.g., Carney v. DeWees, 136 Conn. 256, 70 A.2d 142, 146 (1949); Bierczynski v. Rogers, 239 A.2d 218, 221 (Del.1968); Haddock v. Stewart, 232 Md. 139, 192 A.2d 105, 107 (1963); Nelson v. Nason, 343 Mass. 220, 177 N.E.2d 887, 888 (1961); Boykin v. Bennett, 253 N.C. 725, 118 S.E.2d 12, 16 (1961). See also RESTATEMENT (SECOND) § 876 cmt. b, illus. 6 & § 876 app. Other instances where concert of action liability has been imposed have almost always involved conduct posing a high degree of risk to others. See, e.g., Cobb v. Indian Springs, Inc., 258 Ark. 9, 522 S.W.2d 383, 387, 390 (1975) (one who encouraged another to "see what his car could do" was held liable for encouraging the reckless driving that caused the plaintiff's injuries); Kuhn v. Bader, 89 Ohio App. 203, 101 N.E.2d 322, 327 (1951) (two people target shooting with a high powered rifle and a gravel pile as backstop could both be liable when a ricocheting bullet hit the plaintiff); Price v. Halstead, 177 W.Va. 592, 355 S.E.2d 380, 389 (1987) (passenger who assisted driver in becoming intoxicated was liable for the harm resulting from DUI). Here, in contrast, defendants' conduct was simply not the type of highly dangerous, deviant, or anti-social group activity which was likely to cause serious injury or death to a person or certain harm to a large number of people.

Nor was the amount and kind of assistance rendered of such character as to support imposing liability. While all but two of the defendants passively resisted arrest, and this could have acted as moral support to Salazar, there is no evidence that any defendant gave any verbal encouragement to Salazar during the arrest. The summary judgment evidence is clear that each person made his or her own choice about how to respond to the police

order. We believe it would take far more encouragement than this to militate in favor of imposing liability, especially given the relationship of the defendants to Salazar.

None of the defendants, after all, had a right to control any of the others. They were, at best, acquaintances; in fact, several of the defendants did not even know Salazar at the time of the protest. Further, various defendants, including the one person with whom Salazar clearly was acquainted, were blocking different clinic entrances. These relationships are far too tenuous to weigh in favor of imposing liability.

Finally, nothing in the summary judgment evidence suggests that defendants' states of mind would support liability. Far from intending to harm anyone by their passive activities, the whole purpose of defendants' non-violent resistance was to prevent anyone from being harmed. Moreover, given the training and experience of police officers, there was less reason for defendants to foresee an officer's injury from lifting a person than if the protestors had created a similar risk for ordinary citizens.

Because the summary judgment evidence conclusively disproves that defendants breached any recognized or theoretical duty to Officer Airington, we reverse the judgment of the court of appeals and render judgment that plaintiff take nothing.

GONZALEZ, J., filed a concurring opinion, in which ABBOTT, J., joined.

GONZALEZ, Justice, joined by ABBOTT, Justice, concurring.

Although I concur in the Court's opinion and judgment, I write separately because I believe the Court should use this case as a vehicle to adopt the Fireman's Rule. Additionally, I write to express the view that if the judgment of the court of appeals is allowed to stand, it would have a chilling effect on political speech.

Under the common-law Fireman's Rule, certain professionals, such as police officers and firefighters, are barred from recovery for injuries caused by ordinary negligence as a result of risks inherent in responding to an

emergency. Historically, jurisdictions adopting the Rule applied it only in premises liability cases. It originally barred recovery by firefighters and police officers because they were privileged to enter land pursuant to their public duties and were therefore classified as bare licensees to whom no duty was owed. *Pottebaum v. Hinds,* 347 N.W.2d 642, 644 (Iowa 1984). Some jurisdictions still rely on this rationale to bar recovery by public safety officials. *See, e.g., Furstein v. Hill,* 218 Conn. 610, 590 A.2d 939, 945 (1991) (concluding that police officer could not recover for injuries suffered because of premises defect when responding to residential burglar alarm); *Court v. Grzelinski,* 72 Ill.2d 141, 19 Ill.Dec. 617, 621, 379 N.E.2d 281, 285 (1978) (limiting application of Firemen's Rule to premises liability cases); *Thompson v. Murat Shrine Club, Inc.,* 639 N.E.2d 1039, 1041 (Ind.Ct.App.1994) (refusing to allow firefighters recovery for injuries suffered when loft collapsed); *Gray v. Russell,* 853 S.W.2d 928, 929 (Mo.1993) (noting that Rule bars only recovery for personal injuries suffered in emergency situations because of premises defects); *Cook v. Demetrakas,* 108 R.I. 397, 275 A.2d 919, 922–23 (1971) (supporting application of Rule on premises liability grounds when police officer was injured on stairway).

Other jurisdictions rely on the assumption-of-risk doctrine to bar recovery to police officers and firefighters for damages suffered as a result of risks inherent in their job duties. *See, e.g., Walters v. Sloan,* 20 Cal.3d 199, 142 Cal.Rptr. 152, 571 P.2d 609, 612 (1977) (holding that police officer summoned to party who suffered injuries while attempting to arrest drunken minor could not recover because he assumed risk); *Chinigo v. Geismar Marine, Inc.,* 512 So.2d 487, 490–92 (La.Ct.App.1987) (concluding that Firemen's Rule bars only ordinary negligence actions based on assumption of risk and allowing police officer investigating chemical leak to recover when defendant's conduct was wanton); *Wax v. Co-Operative Refinery Ass'n,* 154 Neb. 805, 49 N.W.2d 707, 709–10 (1951) (supporting Rule based on assumption of risk in case in which firefighter was killed in gas explosion); *Steelman v. Lind,* 97 Nev. 425, 634 P.2d 666, 667 (1981) (concluding that police officer assumed normal risks inherent in helping motorist and could not recover from motorist who required aid for injuries sustained when another car hit officer); *Moreno v. Marrs,* 102 N.M. 373, 695 P.2d 1322, 1327 (App.1984) (asserting limited assumption-of-risk basis for Rule when firefighter suffered injuries inside burning building); *Chesapeake & Ohio Ry. v. Crouch,* 208 Va. 602, 159 S.E.2d 650, 654, *cert. denied,* 393 U.S. 845, 89 S.Ct. 128, 21 L.Ed.2d 115 (1968) (asserting assumption-of-risk rationale for Rule when firefighter was killed in negligently started forest fire).

Still others rely on public policy considerations to bar recovery. Some of these policy considerations include a form of assumption of risk. *See, e.g., Grable v. Varela,* 115 Ariz. 222, 564 P.2d 911, 912 (App.1977) (refusing, based on public policy, to allow firefighter to recover against one whose negligence caused fire in which he was injured); *Waggoner v. Troutman Oil Co.,* 320 Ark. 56, 894 S.W.2d 913, 915 (1995) (adopting Fireman's Rule on public policy grounds and holding that firefighter could not recover from individuals who negligently started kerosene storage tank fire); *Carpenter v. O'Day,* 562 A.2d 595, 601 (Del.Super.Ct.1988) (applying Rule, based on public policy rationale, to bar recovery for firefighter's injuries sustained while fighting fire in restaurant); *Bycom Corp. v. White,* 187 Ga.App. 759, 371 S.E.2d 233, 235 (1988) (holding that injured firefighter could not recover, based on public policy considerations, against corporation whose agents allegedly ruptured natural gas pipeline); *Thomas v. Pang,* 72 Haw. 191, 811 P.2d 821, 823 (1991) (relying on public policy grounds to deny firefighter recovery for injuries from one who negligently maintained building); *Winn v. Frasher,* 116 Idaho 500, 777 P.2d 722, 724–25 (1989) (denying recovery to police officer, based on public policy, for injuries resulting from exposure to chemicals); *Pottebaum,* 347 N.W.2d at 647–48 (concluding that police officers could not recover, based on public policy, for injuries sustained when an intoxicated patron assaulted them when they attempted to stop disturbance at tavern); *Calvert v. Garvey Elevators, Inc.,* 236 Kan. 570, 694 P.2d 433, 438 (1985) (reaf-

firming Kansas's support of Rule on public policy grounds when firefighter was injured by ammonia leak); *Hawkins v. Sunmark Indus., Inc.*, 727 S.W.2d 397, 400 (Ky.1986) (upholding Rule on policy grounds when firefighter was injured in gasoline explosion); *Flowers v. Rock Creek Terrace*, 308 Md. 432, 520 A.2d 361, 368 (1987) (refusing recovery on public policy grounds for firefighter who fell twelve stories down elevator shaft while fighting fire); *Kreski v. Modern Wholesale Elec. Supply Co.*, 429 Mich. 347, 415 N.W.2d 178, 186 (1987) (adopting Rule on public policy grounds and not allowing firefighter's widow to recover against building owner and power company that allegedly caused fire); *England v. Tasker*, 129 N.H. 467, 529 A.2d 938, 941 (1987) (refusing to allow recovery, based on public policy, to police officer injured while attempting to pull passenger from wrecked automobile); *Zanghi v. Niagara Frontier Trans. Comm'n*, 85 N.Y.2d 423, 626 N.Y.S.2d 23, 27–28, 649 N.E.2d 1167, 1171–72 (1995) (concluding that firefighters and police officers could not recover for personal injuries suffered because they assumed risk and that recovery would violate public policy); *Scheurer v. Trustees of Open Bible Church*, 175 Ohio St. 163, 192 N.E.2d 38, 43 (1963) (upholding Rule on public policy grounds when police officer was injured when he fell into hole during investigation); *Carson v. Headrick*, 900 S.W.2d 685, 690–91 (Tenn.1995) (holding that police officer could not recover, based on public policy, for injuries sustained when shot by estranged husband of woman he escorted home to pick up belongings); *Hauboldt v. Union Carbide Corp.*, 160 Wis.2d 662, 467 N.W.2d 508, 511–12 (1991) (limiting application of Rule to negligence cases based on policy considerations).[1]

I recognize that the Fireman's Rule has been employed in Texas only in premises liability cases. *See, e.g., Peters v. Detsco, Inc.*, 820 S.W.2d 38, 40 (Tex.App.—Houston [14th Dist.] 1991, writ denied). The court of appeals used this rationale in denying the Rule's application to this case. 883 S.W.2d 286, 291. However, such a narrow interpretation of the Fireman's Rule is not consistent with the trend in other jurisdictions to extend the Rule beyond premises liability based on public policy.

Police officers and firefighters, by the very nature of their duties, encounter hazardous situations on a regular basis. These hazardous situations often lead to officers being injured in the line of duty. Such injuries are often caused by negligent acts. When officers are called to a scene and are injured as a result of the very situation that required their presence, they should not be allowed to recover from an individual for their personal injuries. Citizens should in no way be "discouraged from relying on those public employees who have been specially trained and paid to deal with these hazards." *Pottebaum*, 347 N.W.2d at 645. In addition, the risk and cost of injuries to officers are more effectively spread by passing them on to the public as a whole through the government entities that employ them rather than by making an individual pay for the injury. For example, police officers and firefighters can recover for injuries sustained during employment under the Workers' Compensation Act. Tex.Lab.Code §§ 401.001–418.002 (Supp. 1996). Thus, public policy justifies the adoption of the Fireman's Rule and calls for it to be applied more broadly than the premises liability context.

Applying this rule to Barbara Baldwin, Airington cannot recover.[2] Airington was

1. At least four states have abolished the Fireman's Rule. *See, e.g.*, Fla.Stat. ch. 112.182 (Supp. 1996); Minn.Stat. § 604.06 (Supp.1996); N.J.Stat.Ann. § 2A:62A–21 (Supp.1996); *Christensen v. Murphy*, 296 Or. 610, 678 P.2d 1210, 1218 (1984). For other sources discussing the background and application of the Fireman's Rule, *see generally* Caner, Annotation, *Application of "Fireman's Rule" to Preclude Recovery by Peace Officer for Injuries Inflicted by Defendant in Resisting Arrest*, 25 A.L.R.5th 97 (1994), and Tinney, Annotation, *Liability of Owner or Occupant of Premises to Police Officer Coming Thereon in Discharge of Officer's Duty*, 30 A.L.R.4th 81 (1984).

2. Only one defendant, Barbara Baldwin, raised the Fireman's Rule as a defense in her motion for summary judgment. Therefore, all other defendants waived relief on this basis. *See* Tex. R.Civ.P. 166a(c); *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 677 (Tex.1979) (holding that movant's grounds for summary judgment must be in writing and before trial

called to the abortion clinic in his official capacity as a police officer to remove Baldwin and other protestors who were blocking the clinic's entrance. While performing his duties by removing a protestor who refused to leave the premises, he injured his back. Under the Fireman's Rule, Airington cannot recover because his injuries were caused by the very conduct that initially required his presence—demonstrators refusing to leave the premises voluntarily. While the Rule does not normally apply in cases in which an officer is injured by intentional, malicious, or reckless conduct by a citizen, *see, e.g., Carson*, 900 S.W.2d at 690–91, that exception does not apply in this case. Airington sued the protestors for negligence, not intentional or reckless acts. Thus, the Fireman's Rule applies to his cause of action.

Additionally, I fear that allowing Airington to recover in this case would impair the protestors' rights to political speech. Throughout history, state actors have attempted to limit individual free speech rights by a variety of means. However, many types of political speech have been protected under the First Amendment. *See, e.g., Texas v. Johnson*, 491 U.S. 397, 404–06, 109 S.Ct. 2533, 2539–41, 105 L.Ed.2d 342 (1989) (protecting citizen's right to burn United States flag at political convention); *Tinker v. Des Moines Indep. Community Sch. Dist.*, 393 U.S. 503, 514, 89 S.Ct. 733, 740, 21 L.Ed.2d 731 (1969) (allowing students to wear black arm-bands to protest Vietnam War); *Brown v. Louisiana*, 383 U.S. 131, 142–43, 86 S.Ct. 719, 724–25, 15 L.Ed.2d 637 (1966) (concluding that silent sit-in to protest segregationist policies was protected political speech); *Stromberg v. California*, 283 U.S. 359, 369–70, 51 S.Ct. 532, 535–36, 75 L.Ed. 1117 (1931) (permitting flying of red flag as a political statement).

For example, in *Brown*, five African–Americans staged a silent sit-in in a public library to protest the facility's segregationist policies. When they refused to leave the premises, the sheriff and his deputies arrested them. The United States Supreme Court held that the Louisiana "breach of the peace" law under which the protestors were arrest-

ed violated the protestors' right to free speech. *Brown*, 383 U.S. at 142–43, 86 S.Ct. at 724–25. The Court stated that "[freedom of speech and assembly] rights are not confined to verbal expression. They embrace appropriate types of action which certainly include the right in a peaceable and orderly manner to protest by silent and reproachful presence...." *Id.* at 142, 86 S.Ct. at 724. One can imagine the chilling effect on the protestors' speech in *Brown* if, after winning their constitutional challenge, they were then sued by the arresting officers for negligence. Such an action would comprise a back-door attack by state actors on a constitutional right—the right to political speech.

Likewise, if this Court were to allow Airington to recover against the protestors in this case, we would provide yet another impairment to political speech. The protestors in this case, like those in *Brown*, practiced civil disobedience to an order to leave the premises by going limp when asked to leave. There is little doubt that allowing a peace officer to sue such a protestor for personal injuries resulting from having to remove the protestor will have a chilling effect on a constitutionally protected right. I do not believe we can allow Airington to prevail and still protect the protestors' right to free speech and peaceable assembly. Political speech is too important a constitutional right to be undermined by a case like this one.

For these additional reasons, I concur in the Court's judgment that Airington is barred from recovery in this case.