Opinion issued May 18, 2017



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-15-01068-CV

———————————

## GILAD LUTFAK AND OREN LUTFAK, Appellants

## V.

## JEFF GAINSBOROUGH, Appellee

---

**On Appeal from the 127th District Court
Harris County, Texas
Trial Court Case No. 2012-73748**

---

## MEMORANDUM OPINION

Appellants Gilad and Oren Lutfak appeal from a judgment in favor of appellee

Jeff Gainsborough. Gainsborough sued Gilad and Oren based on claims arising out

of his purchase of a townhome. A jury found that Gilad, the seller, committed fraud,

breached implied warranties, violated the Deceptive Trade Practices Act, and made

negligent misrepresentations. The jury also found that Oren conspired with Gilad during the sale of the home. Based on these findings and the damages awarded by the jury, the trial court rendered judgment in favor of Gainsborough, against both Oren and Gilad.

Because Gainsborough executed an "as is" earnest money sales contract when he purchased the home, he cannot satisfy the reliance or causation elements of his fraud, DTPA, and negligent-misrepresentation claims. Further, the evidence was legally insufficient to support the jury's affirmative findings on breach of implied warranties. We therefore reverse the trial court's judgment against Gilad and render judgment that Gainsborough take nothing on his claims against him. Additionally, because of our disposition of Gainsborough's claims against Gilad, there was no unlawful conduct to support a judgment based on the jury's conspiracy finding. Thus, we also reverse the trial court's judgment with respect to Oren and render judgment that Gainsborough take nothing on those claims as well.

**Background**

The homes at 514 and 516 West Polk Street in Houston, Texas are connected townhomes. Gilad Luftak owned 514 West Polk and his brother, Oren Luftak, owned 516 West Polk. Gilad purchased his home in 2009 from Hampton Development Corporation. This sale was evidenced by a "New Home Contract" and a special warranty deed between Hampton Development and Gilad. In 2010, Gilad put his

2

home up for sale, and Jeff Gainsborough became interested in leasing it from him. After entering into a lease, Gainsborough decided to try to buy the home.

There were several meetings between Gainsborough, Gilad, and their real estate agents prior to their agreement on the sale of the townhome. During those meetings, Gilad represented to Gainsborough that he and his brother Oren were the "builders" of the townhomes, that the townhomes were "brand new," and that he was the only person who had lived in the 514 West Polk townhome. In addition, during one of the meetings before the execution of the contract, Gainsborough noticed water damage around one of the windows. Gilad represented to Gainsborough that the damage was the result of a burst pipe that had been "taken care of." Gilad allegedly stated that the water stain "could easily be painted over" and that "it was cosmetic."

In December 2010, Gainsborough and Gilad entered into a standard Texas Real Estate Commission One to Four Residential Resale Contract. Gainsborough agreed to pay $484,000 to buy the home in "its present condition." The contract provided for the buyer to deposit $4,200 as earnest money which would be paid to seller as liquidated damages in the event of a default by the buyer. The contract stated that Gilad had provided a "Seller's Disclosure Notice Pursuant to §5.008, Texas Property Code," and it gave Gainsborough the right to inspect the home prior to closing. The contract further provided that, for nominal consideration of $100,

3

Gainsborough retained "the unrestricted right to terminate this contract" during a ten-day "termination option" period. The contract listed Korloch, Inc. as the builder of the home, not Gilad or his brother.

The day after execution of the contract, Gainsborough had the home inspected, which resulted in the identification of numerous problems. The very next day—two days after the execution of the sales contract, and within the termination option period—Gainsborough and Gilad formally amended their contract on a TREC form, which appended the home inspection report and required "[a]ll items . . . to be addressed and repaired as required." Gainsborough and Gilad later supplemented the terms of the amended sales contract by entering into a written escrow agreement. Under the terms of the escrow agreement, Gainsborough placed $2,500 of the purchase price in escrow and Gilad agreed to make certain repairs identified in the inspection report. If Gilad made the repairs within 30 days of the escrow, he would be entitled to demand release of the escrowed $2,500. If he did not make the repairs, then Gainsborough could demand the $2,500 from escrow and make the repairs himself. The amendment and escrow agreement did not alter the term that Gainsborough was purchasing the home in "its present condition."

At closing, Gainsborough accepted and signed a special warranty deed. According to this deed, Gainsborough purchased the property:

> . . . **AS IS, WHERE IS, AND WITH ALL FAULTS, AND WITHOUT ANY REPRESENTATIONS OR WARRANTIES**

4

**WHATSOEVER, EXPRESS OR IMPLIED, WRITTEN OR ORAL, IT BEING THE INTENTION OF GRANTOR AND GRANTEE TO EXPRESSLY REVOKE, RELEASE, NEGATE, AND EXCLUDE ALL REPRESENTATIONS AND WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY AND ALL EXPRESS OR IMPLIED REPRESENTATIONS AND WARRANTIES** . . . .

After closing, Gilad did not make the repairs, and Gainsborough demanded and received the $2,500 from escrow. Gainsborough moved into the home and began noticing that it leaked when it rained. In addition to the leaks, Gainsborough discovered several other problems with the home, including that the air conditioning was insufficient to cool it.

Gainsborough hired two contractors to make repairs. He eventually sued Gilad, Oren, and their real estate agent and agency claiming fraud, breaches of warranty, violations of the Deceptive Trade Practices Act, and negligent misrepresentation arising out of the sale of the home. Gilad and Oren's real estate agent and agency settled with Gainsborough prior to trial.

At trial, Gainsborough testified about his interactions with Gilad before and after purchasing the home. He also testified about extensive repairs and the amount of money he paid to make them. In addition, Gainsborough testified about his interaction with Oren, which included a fenceline dispute that occurred after Gainsborough purchased the home.

Gainsborough also offered into evidence a letter from an attorney who represented Gilad with respect to claims he brought against Korloch regarding a burst pipe in 2009. Gilad disclosed the burst pipe in the Seller's Disclosure Notice he provided to Gainsborough. The letter, along with photographs taken by Gilad's insurer, indicated that the damage caused by the burst pipe may have been more severe than Gilad had suggested on his seller's disclosure or during discussions with Gainsborough.

Gainsborough's witnesses at trial included his real estate agent, one of the contractors who made repairs, and a construction-defect expert. They testified to the extensive problems they discovered in the construction of the home. With respect to Oren's involvement in the sale, there was evidence that he may have been the builder of the home, that he had engaged the same real estate agent as Gilad to sell his home at 516 West Polk at the same time as the sale to Gainsborough took place, and that he occupied all of the officer positions at Korloch, the company listed as the builder of the 514 West Polk home.

The jury found that Gilad had committed fraud, violations of the DTPA, breaches of implied warranties, and negligent misrepresentation when he sold the home to Gainsborough. In addition, the jury found that Oren had engaged in a conspiracy with Gilad that caused injury to Gainsborough.

Gilad and Oren both moved for judgment notwithstanding the verdict, arguing that the earnest money contract and other agreements precluded a judgment in Gainsborough's favor. The court denied their motions and rendered judgment in favor of Gainsborough against both Gilad and Oren, awarding damages, attorney's fees, and prejudgment interest. The court's judgment found Gilad and Oren jointly and severally liable for the damages awarded.

Gilad and Oren both appealed.

**Analysis**

Gilad and Oren have raised numerous issues on appeal. Among other things, they challenge the sufficiency of the evidence supporting different portions of the judgment. In addition, they argue that the sales contract precluded Gainsborough's claims as a matter of law.

I.    **Fraud, DTPA, and negligent-misrepresentation claims against Gilad**

A.    **Effect of buyer's acceptance of property "in its present condition"**

Gilad and Oren contend that the "Acceptance of Property Condition" provision in the TREC contract used by the parties constitutes an "as is" clause. That provision stated that Gainsborough accepted the property "in its present condition." Gilad and Oren argue that Gainsborough conducted his own inspection of the home after entering into the agreement. They contend that the "as is" agreement and

7

inspection negate the reliance elements necessary to establish fraud, a violation of the DTPA, or negligent misrepresentation.

Numerous courts have held that the TREC contract's use of the words "in its present condition" constitutes an "as is" provision. *See, e.g.*, *Ritchey v. Pinnell*, 324 S.W.3d 815, 820 (Tex. App.—Texarkana 2010, no pet.). Gainsborough does not contend otherwise. Instead, he makes several different arguments why the "as is" provision does not bar his claims in this case. Therefore, we will treat the clause as the equivalent of an "as is" clause. *See Williams v. Dardenne*, 345 S.W.3d 118, 123 (Tex. App.—Houston [1st Dist.] 2011, pet. denied).

A buyer who purchases property "as is" chooses "to rely entirely upon his own determination" of the property's value and condition without any assurances from the seller. *Id*. (citing *Prudential Ins. Co. of Am. v. Jefferson Assocs., Ltd.*, 896 S.W.2d 156, 161 (Tex. 1995), and TEX. BUS. & COM. CODE § 2.316(c)(1)). Thus, the buyer assumes the responsibility of assessing the property's value and condition as well as the resulting risk that the property is worth less than the price paid. *Id*. at 124. This evaluation on the part of the buyer constitutes a new and independent basis for the purchase, one that disavows any reliance on representations made by the seller. *Id.* Thus, a valid "as is" clause negates the elements of producing cause and reliance for DTPA, fraud, or negligence claims relating to the value or condition of the property. *Id*.

8

Gainsborough contends that the "as is" provision in this case does not negate the elements of reliance necessary for fraud, DTPA, and negligent misrepresentation because the parties agreed to an amendment of the contract and entered into an escrow agreement. Thus, he argues that the amendment and escrow agreement "superseded" the "as is" agreement. We disagree.

When a contract and its amendments are not ambiguous, we construe them according to the plain meaning of their express wording and enforce them as written. *Chapman v. Abbot*, 251 S.W.3d 612, 616–17 (Tex. App.—Houston [1st Dist.] 2007, no pet.). "Our primary concern when interpreting a contract is to ascertain and give effect to the intent of the parties as that intent is expressed in the contract." *Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006). "To achieve this objective, courts should examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005).

In this contract, under the "Acceptance of Property Condition" section, the parties checked a box indicating that "buyer accepts the property in its present condition." After Gainsborough had the house inspected, the parties supplemented their contract. The amendment contained a provision that read:

> In addition to any repairs and treatments otherwise required by the contract, Seller, at Seller's expense, shall complete the following

9

repairs and treatments: All items per email and home inspection report (exhibit A) to be addressed and repaired as required.

"Exhibit A" attached to the amendment consisted of emails from Gainsborough's real estate agent and the inspection report listing items that needed to be repaired. Gilad and Gainsborough later entered into an escrow agreement that required Gilad to make the repairs specified in the contract amendment. The escrow agreement provided that Gainsborough would place $2,500 into escrow. Once Gilad delivered a sworn statement to the title company stating that all work had been completed and demanded release of the escrow, the title company would deliver the escrow to him. If, after 30 days, Gilad had not delivered a sworn statement, Gainsborough could deliver a sworn statement saying that all work had not been completed, and demand release of the escrow to him.

The plain language of the contract amendment and escrow agreement did not "supersede" the original contract terms to the extent they incorporated an "as is" provision. Instead, the amendment and escrow agreement imposed a new, additional requirement that Gilad make certain repairs to receive the $2,500 being held in escrow. Neither the amendment nor the escrow agreement conditioned Gainsborough's acceptance of the property on Gilad making the repairs. After the parties entered into the escrow agreement and executed the amendment, Gainsborough still accepted the property "in its present condition," but he effectively would receive a $2,500 discount on the sales price if Gilad did not make the repairs

as agreed. Thus, the "as is" condition of the contract remained in effect. *See Williams*, 345 S.W.3d at 123–24.

## B. Fraudulent inducement of "as is" acceptance of property

Gainsborough further contends that the "as is" agreement was ineffective and should not preclude a judgment based on fraud, violations of the DTPA, or negligent misrepresentation because it was fraudulently induced. An "as is" clause that is induced by specific misrepresentations about the condition of property will not shield the seller from liability. *Id*. at 124 (citing *Prudential*, 896 S.W.2d at 162).

"Fraudulent inducement . . . is a particular species of fraud that arises only in the context of a contract and requires the existence of a contract as part of its proof. That is, with a fraudulent inducement claim, the elements of fraud must be established as they relate to an agreement between the parties." *Haase v. Glazner*, 62 S.W.3d 795, 798–99 (Tex. 2001); *Williams*, 345 S.W.3d at 124–25. The elements of fraud are that a material representation was made, the representation was false, the speaker knew the statement was false when made, the statement was made to induce reliance, it did induce reliance, the reliance was justifiable, and the relying party suffered injury as a result. *See Williams*, 345 S.W.3d at 125. In the context of a fraudulent-inducement claim, the reliance element requires evidence that the claimant would not have entered into the contract but for the alleged misrepresentation or fraudulent nondisclosure. *See id*. at 126.

11

In support of his argument that he was fraudulently induced into signing the "as is" agreement, Gainsborough contends that Gilad concealed known defects from him. Specifically, Gainsborough argues that Gilad falsely represented that he did not know of any water penetration or wood rot, falsely claimed the water stains Gainsborough saw were merely cosmetic remnants of the burst pipe, and fraudulently concealed his knowledge that the sale of the house violated the Residential Construction Liability Act and the DTPA.

With respect to Gainsborough's claims that Gilad falsely represented that he did not know of any water penetration or wood rot and that he fraudulently concealed knowledge that the sale of the house violated the RCLA and the DTPA, the only evidence presented at trial to support these arguments was a Seller's Disclosure Notice and a letter and photographs related to a previous pipe break in the townhome.

Gilad provided the Seller's Disclosure Notice to Gainsborough prior to the execution of the earnest money contract. Gilad disclosed that an "unwrapped pipe in attic broke in winter of 2009," and that the pipe "was repaired and wrapped, replaced sheetrock and insulation." Gilad also checked a box on the disclosure stating that he was not aware of any wood rot in the house. At trial, Gainsborough offered into evidence a letter from Yaron Lutfak, Gilad's attorney. In the letter, Yaron indicated that he was representing Gilad regarding the construction of the townhome. The letter was sent to Korloch, the builder of the townhome, and stated that it was to

12

provide notice of Gilad's "claim under the Texas Residential Construction Liability Act, the DTPA, and under Chapter 38.002 of the Texas Civil Practice and Remedies Code." These claims were based on a 2009 burst pipe which "flooded" the home with water and cost Gilad $150,000 in repairs. In addition to the letter, Gainsborough offered and the court admitted photographs taken of the home by Gilad's insurer as a result of the pipe burst. According to Gainsborough's expert and a contractor who worked on the home for Gainsborough, the photos showed evidence of wood rot in 2010, prior to Gilad completing and giving Gainsborough the Seller's Disclosure Notice that indicated he knew of no wood rot.

In addition to the letter and photographs, Gainsborough argues that Gilad made false statements to him regarding water stains. He contends that these statements induced him into purchasing the house. These statements allegedly occurred while Gainsborough and Gilad were walking through the home prior to entering into the earnest money contract. Gilad allegedly told Gainsborough that the water stains around a window were merely cosmetic issues.

To the extent this evidence indicates that Gilad concealed material information from Gainsborough or made false material statements to him, in this context Texas courts consistently have concluded that a buyer's independent inspection precludes a showing of causation and reliance if the buyer continued to complete the purchase after the inspection revealed the same information that the

13

seller allegedly failed to disclose. *Williams*, 345 S.W.3d at 125–26; *see also Lesieur v. Fryar*, 325 S.W.3d 242, 246 (Tex. App.—San Antonio 2010, pet. denied); *Birnbaum v. Atwell*, No. 01-14-00556-CV, 2015 WL 4967057, at \*7–8 (Tex. App.—Houston [1st Dist.] Aug. 20, 2015, pet. denied) (mem. op.). This is particularly true when the buyer relies on an independent inspection disclosing the information to renegotiate the sales contract. *Williams*, 345 S.W.3d at 122, 125–26 (after independent inspection, option period was extended and contract was amended to require additional repairs and treatments); *Dubow v. Dragon*, 746 S.W.2d 857, 858–61 (Tex. App.—Dallas 1988, no writ) (after an inspection which was a "condition precedent to closing," buyers negotiated a $17,500 reduction in sales price).

In this case, after entering into the contract, Gainsborough had an inspection performed on the home. This inspection revealed several areas of concern that Gainsborough argued Gilad had concealed from him. The inspection reported:

> . . . roof top balcony drains and gutter were not installed adequately. Water from the balcony drains appears to be overflowing or running past the gutter below down the rear wall of the house. Water also appeared to be running into the east window at the third floor guest bedroom, as indicated by water stains on the sheet rock.

Thus, the inspection revealed the cause of the water stains around the window. Further, the inspector also indicated that metal drip flashing was installed improperly and required repair to ensure "adequate water shed." The inspector also noted that "vulnerability to water penetration was observed where the roof intersects the

14

dividing wall at the roof top balcony," and he recommended further investigation with the builder.

Ultimately, the inspector concluded that there was evidence of water penetration and water damage, but the causes of the penetration and damage could not be determined. The inspector recommended that Gainsborough obtain a cost estimate to determine how much it would cost to stop the penetration and repair the damage. Based on these and other findings in the inspection report, during the termination option period Gainsborough renegotiated the earnest money contract to add the amendment requiring Gilad to perform repairs of the property. He also obtained an agreement that Gilad would forfeit a portion of the purchase price if he failed to perform the repairs. The inspection, however, did not cause Gainsborough to renegotiate the contract in such a way as to remove the "as is" provision.

Gainsborough relies upon *Nelson v. Najm*, 127 S.W.3d 170 (Tex. App.—Houston [1st Dist.] 2003, pet. denied), to support his contention that he was fraudulently induced into signing the "as is" agreement. *Nelson* is distinguishable. In that case, Najm purchased a gas station from the Nelsons. *Id*. at 172. The Nelsons failed to disclose the existence of an underground waste oil tank to Najm, and they affirmatively told him that no inspection was necessary. *Id*. at 172–73. No inspection was conducted, yet the deed included a provision noting that Najm had inspected the property and was relying solely on his own investigation. *Id*. at 173. In addition, the

15

earnest money contract contained an "as is" provision. *Id.* After closing, Najm discovered the underground waste oil tank and that the property was not in compliance with environmental standards. *Id.* Najm sued the Nelsons for fraud and wrongful foreclosure, and the trial court awarded him damages. *Id.* at 173–74. On appeal, the trial court record reflected the Nelsons' affirmative misrepresentations that an inspection was not necessary and failure to disclose a material fact about the existence of the waste oil tank. *Id.* at 174–75. The Nelsons argued that the "as is" clause in the contract and the independent inspection provision in the deed precluded a finding in Najm's favor. *Id.* This court relied upon *Prudential Insurance v. Jefferson Associates*, 896 S.W.2d 156 (Tex. 1995), for the proposition that a fraudulently induced "as is" provision does not negate the causation element essential to fraud. *Id.* at 175–76. As a result, this court held that the "as is" provision at issue in the case did not preclude a finding of fraud. *Id.* at 176. The court stated: "Given the circumstances here, we conclude that the 'as-is' clause was not valid because Nelson concealed a known fact, and we hold that this clause did not preclude Najm's recovery on his fraud claims." *Id.*

Unlike the facts in *Nelson*, Gainsborough actually conducted an inspection of the property prior to closing, and this inspection revealed several areas of concern. Because Gainsborough conducted his own inspection of the property which uncovered potential defects in the home causing him to renegotiate the earnest

16

money contract, we find that Gainsborough has not produced legally sufficient evidence to demonstrate that he was fraudulently induced into signing the "as is" earnest money contract. *See Williams*, 345 S.W.3d at 128; *Birnbaum*, 2015 WL 4967057, at *8.

Because the "as is" clause in the parties' contract was not fraudulently induced, the clause precludes Gainsborough from establishing the elements of causation and reliance with respect to his fraud, DTPA, and negligent misrepresentation claims against Gilad. *See Prudential*, 896 S.W.2d at 161–62; *Welwood v. Cypress Creek Estates, Inc.*, 205 S.W.3d 722, 726–27 (Tex. App.—Dallas 2006, no pet.); *Larsen v. Carlene Langford & Assocs., Inc.*, 41 S.W.3d 245, 253 (Tex. App.—Waco 2001, pet. denied).

## II. Breaches of implied warranties

The Luftaks also challenge the judgment against them for breaching the warranties of habitability and construction in a good and workmanlike manner implied in the sale of a new home.

A builder of a new home impliedly warrants that the residence is suitable for human habitation and is constructed in a good and workmanlike manner. *Centex Homes v. Buecher*, 95 S.W.3d 266, 269 (Tex. 2002); *Humber v. Morton*, 426 S.W.2d 554, 555 (Tex. 1968). The implied warranty of habitability ensures that a new home buyer receives a house that is structurally sound, habitable, and free of hidden

17

defects. *See Centex Homes*, 95 S.W.2d at 274. It extends only to defects that render the property so defective that it is unsuitable for its intended use as a home. *Id*. at 275. The implied warranty of good workmanship defines the level of performance expected when the parties fail to make express provision in the contract. *Id*. at 274.

Among other arguments, Gilad and Oren argue that the evidence was insufficient to support the jury's affirmative finding on these issues. We will sustain a legal sufficiency or "no-evidence" challenge if the record shows: (1) a complete absence of evidence of a vital fact, (2) rules of law or evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence conclusively establishes the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). In conducting a legal sufficiency review, a court must consider the evidence in the light most favorable to the verdict and indulge every reasonable inference that would support it. *Id*. at 822. If the evidence allows only one inference, neither jurors nor the reviewing court may disregard it. *Id*.

When the parties have not objected at trial to the substance of the law set forth in the jury charge, we review sufficiency of the evidence in light of legal standards contained in the unobjected-to charge. *See, e.g.*, *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000) ("[I]t is the court's charge, not some other unidentified law, that

18

measures the sufficiency of the evidence when the opposing party fails to object to the charge.").

The implied warranties of habitability and construction in good and workmanlike manner extend from the builder to subsequent purchasers of the property. *See Gupta v. Ritter Homes, Inc.*, 646 S.W.2d 168, 169 (Tex. 1983); *Wiggins v. Overstreet*, 962 S.W.2d 198, 200 (Tex. App.—Houston [14th Dist.] 1998, pet. denied). But a nonbuilder owner selling a used home does not impliedly warrant the habitability of the home, nor that the construction of the home was performed in a good and workmanlike manner. *See Gupta*, 646 S.W.2d at 169; *Wiggins*, 962 S.W.2d at 200; *Podder v. Funding Partners L.P.*, No. 03-09-00458-CV, 2010 WL 850175, at *3–4 (Tex. App.—Austin Mar. 12, 2010, pet. denied) (mem. op.).

In this case, jury questions 5 and 6 asked whether the house at 514 West Polk failed to fulfill the warranty requirements of habitability and construction in a good and workmanlike manner. The questions defined each implied warranty and then included the instruction that "the warranty of habitability" and "the warranty of construction in a good and workmanlike manner" only apply in a sale from a "builder" to the "original purchaser." Thus, although the builder's implied warranties of habitability and construction in a good and workmanlike manner can apply to a subsequent purchaser, the court's charge required the jury to find that Gainsborough was the "original purchaser" of the property. Because Gainsborough

19

did not object to the charge question as given, we review the sufficiency of the evidence to support the jury's finding that Gilad or Oren was the "builder" of the property and that Gainsborough was the "original purchaser." *See Osterberg*, 12 S.W.3d at 55.

While there was conflicting evidence regarding whether Gilad or Oren were the builders of the property, the evidence regarding the "original purchaser" of the home was undisputed. The evidence at trial included a "New Home Contract" in which Gilad agreed to purchase the home at 514 West Polk from Hampton Development. The evidence also included a special warranty deed in which Hampton Development conveyed the property to Gilad in November 2009. The sale between Gilad and Gainsborough occurred in December 2010. Thus, the evidence showed that Gilad purchased the property from a developer before Gainsborough's purchase. Gilad also signed a promissory note in 2009 when he purchased the home from the developer. Further, the sales contract between Gilad and Gainsborough was entitled a "Resale" contract. This evidence allows for only one inference, that Gilad was a purchaser of the property prior to Gainsborough becoming a purchaser. Therefore, Gainsborough could not be the "original purchaser" of the home.

Because the evidence only allows for the inference that Gainsborough was a subsequent purchaser of the property, we conclude that the evidence was legally insufficient to support the jury's affirmative finding that Gilad or Oren breached the

20

implied warranties of habitability and construction in a good and workmanlike manner as defined in the jury charge. *See City of Keller*, 168 S.W.3d at 810.

## III.    Conspiracy claim

The Lutfaks raise several issues in support of their contention that the trial court erred by rendering judgment against Oren based on the jury's conspiracy finding. We need not address these issues, however, because our disposition of the foregoing issues require reversal of the trial court's judgment against Oren. *See* TEX. R. APP. P. 47.1.

A civil conspiracy is a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983). The essential elements of a civil conspiracy are (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result. *Triplex Commc'ns, Inc. v. Riley*, 900 S.W.2d 716, 719 (Tex. 1995); *Massey*, 652 S.W.2d at 934.

Because a defendant's liability depends on participation in an underlying tort for which the plaintiff seeks to hold the defendant liable, conspiracy is a derivative tort. *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996). "The 'gist' of a civil conspiracy is the injury that is intended to be caused." *Triplex Commc'ns*, 900 S.W.2d at 720. Proof of a joint intent to engage in the conduct that resulted in the

21

injury, without more, does not establish a cause of action for civil conspiracy. *Juhl v. Airington*, 936 S.W.2d 640, 644 (Tex. 1996). Civil conspiracy instead requires the specific intent to agree to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. *Id.*; *A.H. Belo Corp. v. Corcoran*, 52 S.W.3d 375, 384 (Tex. App.—Houston [1st Dist.] 2001, pet. denied). "[T]he parties must be aware of the harm or wrongful conduct at the inception of the combination or agreement." *Triplex Commc'ns*, 900 S.W.2d at 719.

In this case, the jury found that Oren entered into a conspiracy with Gilad, and the trial court entered judgment against him based on this finding. Because conspiracy is a derivative tort, to support the trial court's judgment there had to be an underlying tort or statutory violation that Gilad and Oren had conspired to accomplish. *See Juhl*, 936 S.W.2d at 644. Because we have concluded that the "as is" agreement between Gilad and Gainsborough precludes a judgment based on fraud, violations of the DTPA, or negligent misrepresentation, there was no actionable claim based on alleged breach of an implied warranty by either Gilad or Oren, and the jury found that Oren did not independently commit fraud, violations of the DTPA, or negligent misrepresentation, there was no underlying tort or unlawful conduct to support the trial court's judgment against Oren. *Id.* Thus, the trial court erred by entering judgment against Oren.

## Conclusion

We hold that the "as is" provision in the parties' sales contract precludes a judgment in Gainsborough's favor on his fraud, DTPA, and negligent misrepresentation claims. Further, we conclude that the evidence was legally insufficient to support the jury's affirmative finding that Gilad or Oren breached the implied warranties of habitability and construction in a good and workmanlike manner as defined in the jury charge. Finally, based on our disposition of those issues, there was no underlying tort or unlawful conduct to support the trial court's judgment on the jury's conspiracy findings against Oren. Because of our resolution of these issues, we need not address the remaining issues. *See* TEX. R. APP. P. 47.1. We reverse the trial court's judgment with respect to both Gilad and Oren Lutfak and render judgment that Gainsborough take nothing on his claims against both of them.

Michael Massengale
Justice

Panel consists of Justices Massengale, Brown, and Huddle.

23