EDWARD FURSTEIN *v.* RITA B. HILL
(14047)
(14104)

PETERS, C. J., CALLAHAN, GLASS, BORDEN and F. X. HENNESSY, Js.

Argued March 19—decision released May 14, 1991

*Elizabeth Dee Bailey,* for the appellant in the first appeal (intervening plaintiff).

*Jesse M. Frankl,* for the appellant-appellee in the second appeal (plaintiff).

*Robert M. LaRose,* for the appellee-appellant in the second appeal (defendant).

PETERS, C. J. The dispositive issue in this consolidated appeal is whether a police officer occupies the status of an invitee or of a licensee when, in the course of performing his official duties, he is injured by a defective condition on the property of a landowner. The plaintiff, Edward Furstein, a West Hartford police officer, brought an action to recover damages for personal injuries that he suffered as the result of investigating a possible burglary at a house owned by the defendant, Rita B. Hill. The town of West Hartford intervened as a plaintiff to recover sums expended in workers' compensation payments to the plaintiff. At the close of the plaintiff's evidence, the defendant moved for a directed verdict on the theory that the plaintiff had not provided a factual foundation to demonstrate her failure to comply with the duty of care owed by a landowner to a licensee. The trial court, *Freed, J.,* denied the motion and submitted the case to the jury, which returned a verdict for the plaintiff reduced in amount by its finding that the plaintiff himself had been 40 percent negligent. Denying motions to set aside the verdict filed by the plaintiff, the intervening plaintiff and the defendant, the trial court rendered judgment in accordance with the verdict and apportioned the award between the plaintiff and the intervening plaintiff. Each of the parties appealed to the Appellate Court and we transferred the consolidated appeals to this court in accordance with Practice Book § 4023. Because we conclude that the defendant's motion for directed verdict should have been granted, we reverse the judgment of the trial court.

The relevant facts are not in dispute. On September 10, 1987, a private alarm company notified the West Hartford police department that a silent burglar alarm had been activated on property owned by the defendant, Rita B. Hill. The police department dis-

patched the plaintiff, police officer Edward Furstein, to investigate the alarm. The plaintiff injured his knee when a board in the deck attached to the rear of the house collapsed as he crossed the deck to inspect the sliding glass doors that provided rear access to the house. As a result of his injury, the plaintiff was unable to work for approximately six months, and suffered a permanent partial disability of the knee.

At trial, the plaintiff produced evidence that the deck had been built in 1980 of untreated wood and that its general condition at the time of the plaintiff's accident in 1987 was "rotting" and "weather beaten." The plaintiff produced no direct evidence that the defendant, who lived in Florida and who did not testify at trial, had actual or constructive knowledge either of the rotted condition of the deck or of the fact that it had been built from untreated wood that would tend to rot more quickly than would chemically preserved wood. The plaintiff did not produce the defendant as a witness, either directly or by deposition, to testify regarding her knowledge of the condition of the deck. He introduced instead as an exhibit the defendant's responses to the plaintiff's interrogatories. These responses established only that the defendant owned the house at the time of the plaintiff's accident, that she acquired the property in May, 1980, that the deck was part of the original house construction in May, 1980, and that it was made of wood and was covered with a stain. The plaintiff produced no evidence that the defendant had ever been on the property, either at the time of acquisition or subsequently, or that any person acting on her behalf had any actual or constructive knowledge of the condition of the deck at the time of the plaintiff's accident. The plaintiff did not attempt to prove that the defendant had actual knowledge of the plaintiff's presence on her property at the time of the accident. Rather, he relied

on the undisputed fact that the police had been summoned to the scene by an alarm company in response to an alarm system that had been installed in 1980 when the defendant acquired the property.

At the close of the plaintiff's evidence, the defendant moved for a directed verdict. She argued that the plaintiff's status on the property, under Connecticut law, was akin to that of a licensee, to whom a landowner would owe a duty of due care only if she had actual or constructive knowledge of the licensee's presence on her property. The defendant further argued that the plaintiff had presented no evidence that would support a finding that she had actual or constructive knowledge either of the defect or of the plaintiff's presence. The plaintiff argued, in opposition to the motion, that his status on the property at the time of the accident was that of an invitee, to whom the plaintiff owed a duty to inspect the premises and to maintain them in a reasonably safe condition.

The trial court, *Freed, J.,* denied the defendant's motion for a directed verdict but instructed the jury that the plaintiff was a licensee. When the jury nonetheless returned a verdict, partially offset by the plaintiff's negligence, in favor of the plaintiff, the court denied all the motions to set the verdict aside and rendered judgment on the jury's verdict.

On appeal, the principal issue is whether the trial court correctly charged the jury that the plaintiff was a licensee rather than an invitee. Once we have resolved that issue of law, we must examine the record to determine the factual sufficiency of the evidence to sustain the jury's award of damages to the plaintiff. We conclude, as the defendant contends, that the trial court's charge was correct but that the court improperly denied her motions for a directed verdict and to set aside the

verdict in light of the plaintiff's failure to satisfy his burden of production regarding the defendant's knowledge of the defective condition and of the plaintiff's presence on the property.

I

The plaintiff's appeal is premised on the proposition that, when he entered onto the defendant's property in response to a burglar alarm triggered by an alarm system installed by the defendant, his status was that of an invitee. Our cases do not support this proposition.

This court first addressed the status of a public officer who is injured on private property while lawfully present in the exercise of his duties in *Roberts* v. *Rosenblatt,* 146 Conn. 110, 148 A.2d 142 (1959). We there held that the plaintiff, a firefighter who had been injured in a fall on an icy sidewalk while present on the premises "in the performance of a public duty under a permission created by law," occupied a status "akin to that of a licensee," to whom the owners of such premises owed "no greater duty than that due a licensee." Id., 113. *Roberts* adopted the principle expressed in the Restatement (Second) of Torts, § 345 (1), that "the liability of a possessor of land to one who enters the land only in the exercise of a privilege, for either a public or a private purpose, and irrespective of the possessor's consent, is the same as the liability to a licensee." 2 Restatement (Second), Torts (1965) § 345 (1), pp. 226–27. The conclusion reached by this court in *Roberts* is a form of the common law doctrine known as the "firefighter's rule." See *Mignone* v. *Fieldcrest Mills,* 556 A.2d 35, 37 n.1 (R.I. 1989).

Although this court has not previously addressed the scope of the applicability of the firefighter's rule, we note that no state that has adopted the rule has declined

to extend it to police officers. *Kreski* v. *Modern Whole-sale Electric Supply Co.,* 429 Mich. 347, 357 n.6, 415 N.W.2d 178 (1987); see also *Flowers* v. *Rock Creek Terrace,* 308 Md. 432, 442 n.4, 520 A.2d 361 (1987); *Berko* v. *Freda,* 93 N.J. 81, 84, 459 A.2d 663 (1983). Having reviewed the history and policy issues underlying the rule, we similarly conclude that the rule applies to police officers as well as to firefighters.

## A

The firefighter's rule has well developed roots in the common law. Although the rule had its origins in a social system in which "the landowner was sovereign within his own boundaries" and owed a licensee only the duty not to injure him wilfully or wantonly; *Dini* v. *Naiditch,* 20 Ill. 2d 406, 413, 170 N.E.2d 881 (1960); the jurisdictions that have applied the rule in recent years have offered more cogent reasons to justify its continued viability.

The most compelling argument for the continuing validity of the rule is the recognition that firefighters and police officers often enter property at unforeseeable times and may enter unusual parts of the premises under emergency circumstances. *Kreski* v. *Modern Wholesale Electric Supply Co.,* supra, 368; *Nared* v. *School District of Omaha,* 191 Neb. 376, 379–80, 215 N.W.2d 115 (1974); 2 Restatement (Second), Torts (1965) § 345 (1), comment (c), p. 228. Such public officers enter the land regardless of the owner's consent; indeed, if the conditions for the exercise of their public duty exist, the owner would not be privileged to exclude them. *Shypulski* v. *Waldorf Paper Products Co.,* 232 Minn. 394, 396, 45 N.W.2d 549 (1951); *Scheurer* v. *Trustees of the Open Bible Church,* 175 Ohio St. 163, 168, 192 N.E.2d 38 (1963); 5 F. Harper, F. James & O. Gray, The Law of Torts (2d Ed. 1986)

§ 27.14, p. 260. Recognizing that only invitees may rely on an implied representation of safety, courts have considered it unreasonable to require landowners to undertake the same standard of care for public officers whose presence the landowners can neither predict nor interdict.[1] "There would be an obvious hardship in holding otherwise, because landowners would then be under compulsion to keep all parts of their premises in a condition perhaps uncalled for by the normal use to which the premises are devoted." *Shypulski* v. *Waldorf Paper Products Co.*, supra, 397; see also 2 Restatement (Second), Torts (1965) § 345 (1), comment (c), p. 228.

Several jurisdictions have explained their adoption of the firefighter's rule by recognizing the inherently hazardous nature of the public safety work performed by firefighters and police officers. Some courts have characterized this recognition as a variant of the doctrine of "assumption of the risk"; see *Krauth* v. *Geller*, 31 N.J. 270, 273–74, 157 A.2d 129 (1960); while others have noted that firefighters and police officers voluntarily choose to enter their professions knowing that

---

[1] This rationale suggests that an exception to the rule may exist when a public officer is injured by a defective condition on a portion of the land held open to the public at a time when the public might reasonably be expected to be present, and courts have indeed recognized such an exception. This exception is noted in the Restatement (Second) of Torts, § 345 (2), which provides that "[t]he liability of a possessor of land to a public officer or employee who enters the land in the performance of his public duty, and suffers harm because of a condition of a part of the land held open to the public, is the same as the liability to an invitee." See *Brady* v. *Consolidated Rail Corporation*, 35 Ohio St. 3d 161, 163–64, 519 N.E.2d 387 (1988) (affirming reversal of a summary judgment in favor of the defendant railroad company because the plaintiff police officer was injured in a railroad right-of-way that the defendant company was statutorily obligated to keep in good repair for the benefit of all members of the public). This exception, however, provides no support to the plaintiff's claim in this case. The plaintiff presented no evidence suggesting that the property involved here is "held open to the public." See 2 Restatement (Second), Torts § 345 (2), supra. The evidence here demonstrated, rather, that the plaintiff's injury occurred on a deck that provided access to the rear entrance of a private residence.

they will often confront physically perilous situations created by the negligence of the public they serve. See *Winn* v. *Frasher,* 116 Idaho 500, 503, 777 P.2d 722 (1989). According to the courts that have relied on this rationale, the public "hires, trains, and compensates fire fighters and police officers to deal with dangerous, but inevitable situations," many of which are caused by negligence. *Kreski* v. *Modern Wholesale Electric Supply Co.,* supra, 366. "The very nature of police work and fire fighting is to confront danger. The purpose of these professions is to protect the public. . . . [T]he public should not be liable for damages for injuries occurring in the performance of the very function police officers and fire fighters are intended to fulfill." Id., 367–68.

This rationale has been extended to situations, such as the one presented in this case, in which an injury results from alleged negligence that is unrelated to the cause of the safety officer's presence on the property. The Supreme Court of New Jersey recently held that a police officer who was injured when he slipped on a powdery white substance on a doughnut shop's kitchen floor while he was rendering emergency medical aid to an employee of the shop could not recover in tort against the shop's owners or operators. *Rosa* v. *Dunkin' Donuts of Passaic,* 122 N.J. 66, 583 A.2d 1129 (1991). The court reasoned that "[f]irefighters and police officers must be held to assume the risks that are to be expected in encountering the hazards and risks of their job. . . . Such risks properly include an ordinary act of negligence that an officer may encounter at the scene of the incident. To hold otherwise creates artificial distinctions between the negligence that occasioned one's presence and the negligence defining the scene at which one arrives . . . ." Id., 73–74.

A third rationale offered by courts that have adopted the firefighter's rule is that permitting firefighters and

police officers to recover in tort for occupational injuries caused by the negligence of particular members of the public whom the officer is called upon to aid would impose a double burden on the taxpayers, who already pay such officers to deal with the hazards that may result from the taxpayers' own future acts of negligence. "Exposing the negligent taxpayer to liability for having summoned the police would impose upon him multiple burdens for that protection." *Berko* v. *Freda,* supra, 87–88. To avoid this potential for double liability, in taxes and in tort, most courts have concluded that the public as a whole, rather than individual landowners, should bear the burden of the foreseeable losses incurred when firefighters or police officers are injured in the performance of their duties. As more than one court has observed, the public should compensate its safety officers both in pay that reflects the hazard of their work and in workers' compensation benefits for injuries suffered when the risks inherent in the occupation materialize. *Giorgi* v. *Pacific Gas & Electric Co.,* 266 Cal. App. 2d 355, 359–60, 72 Cal. Rptr. 119 (1968); *Krauth* v. *Geller,* supra, 274.

Reliance on workers' compensation and other forms of public compensation is also appropriate because "societal responsibility rather than possible tort recovery is the better, surer, and fairer recourse" for a public safety officer injured in the line of duty. *Flowers* v. *Sting Security, Inc.,* 62 Md. App. 116, 140, 488 A.2d 523 (1985), aff'd, 308 Md. 432, 520 A.2d 361 (1987); *England* v. *Tasker,* 129 N.H. 467, 470, 529 A.2d 938 (1987). As one court noted, "the reach of the tax collector is both broader and more persuasive than that of the premium taker." *Giorgi* v. *Pacific Gas & Electric Co.,* supra, 360. In addition, courts have noted that society's recognition of the inherently hazardous nature of the work of public officers has frequently led to the

enactment of special benefits for such workers, above and beyond the benefits ordinarily provided by workers' compensation. See *Walters* v. *Sloan,* 20 Cal. 3d 199, 205, 571 P.2d 609, 142 Cal. Rptr. 152 (1977). Such benefits include, for instance, a statutory presumption of occupational causation for certain diseases; see General Statutes § 7-433a (creating a presumption that hypertension or heart disease is a personal injury that arose in the course of employment); and survivors' benefits for the dependents of police officers and firefighters. See General Statutes § 7-323e.

In summary, both police officers and firefighters have a permission created by law to enter upon private property for an appropriate public purpose, even without the consent of the owner; both are hired and trained to confront hazards in the execution of their duties; and both are entitled to enhanced workers' compensation benefits for injuries that occur in the line of duty. We conclude, for these reasons, that the firefighter's rule adopted by this court in *Roberts* v. *Rosenblatt,* supra, applies to police officers who are injured by defective conditions on private property while the officers are present upon such property in the performance of their duties.

## B

The plaintiff argues that even if the firefighter's rule adopted in *Roberts* v. *Rosenblatt,* supra, is broad enough to encompass police officers, it is nevertheless inapplicable to him for two reasons. First, he contends that General Statutes § 52-557a, enacted four years after this court decided *Roberts* v. *Rosenblatt,* abrogated the common law distinction between licensees and invitees. Alternatively, he contends that he was an invitee because he was present on the property in response to a notification by the defendant's agent that a burglar alarm had been set off there. We find no merit in either claim.

Nothing on the face of § 52-557a supports the plaintiff's argument that the statute was intended to overturn the licensee status of public officers. The statute provides, in its entirety: "The standard of care owed to a social invitee shall be the same as the standard of care owed to a business invitee." The intent of the statute, as declared in the statement of purpose of the substitute committee bill and in the legislative debates, was "[t]o give the same protection to a person invited for occupiers [sic] pleasure as for one who is invited for his business. To enact into law the dissenting opinion in Laube vs. Stevenson, 137 Connecticut 469." Substitute Senate Bill No. 243, 1963 Sess., Connecticut General Assembly (file no. 1209). In *Laube* v. *Stevenson,* 137 Conn. 469, 78 A.2d 693 (1951), a three-member majority of this court held that a social guest was a mere "gratuitous licensee." Id., 473. Two dissenting members of the court argued that social guests should be afforded the same protection as business invitees. Id., 477 (*Jennings, J.,* dissenting as to social visitors "enjoying an express invitation"), and 477–78 (*O'Sullivan, J.,* dissenting as to social visitors with either an express or an implied invitation).

The plaintiff argues that remarks made during the public hearings on the proposed bill evince the intent of the legislature to abrogate the firefighter's rule. We are unpersuaded. Although the committee hearings related to the act contain an inconclusive discussion of the applicability of the proposed act to firefighters and police officers; see Conn. Joint Standing Committee Hearings,[2] Judiciary and Governmental Functions, Pt. 2,

---

[2] Although we have on occasion taken notice of remarks made during legislative hearings as bearing on the problem a statute was designed to solve; see, e.g., *Mahoney* v. *Lensink,* 213 Conn. 548, 559 n.15, 569 A.2d 518 (1990), and *State* v. *Magnano,* 204 Conn. 259, 273–74 n.8, 528 A.2d 760 (1987); in this case the remarks are too ambiguous and contradictory to be of value in determining the intent of the legislature.

1963 Sess., pp. 335–50; the statute as ultimately enacted manifests no legislative undertaking to abrogate all distinctions between licensees and invitees, as at least one state legislature has done.[3] The language of § 52-557a indicates rather that the legislature intended to require a landowner to exercise the same standard of care toward every person whom he "invited" onto his premises, whether the owner extended such an invitation for business or for pleasure. The legislature evidently reasoned that, because the presence of social guests at a particular time and place was as foreseeable as the presence of business invitees, a landowner's duty of care to both groups should be the same.

In the absence of ambiguity, the intent of the legislature is to be found not in what it meant to say but in what it did say. *All Brand Importers, Inc.* v. *Department of Liquor Control,* 213 Conn. 184, 195, 567 A.2d 1156 (1989); *Daily* v. *New Britain Machine Co.,* 200 Conn. 562, 571, 512 A.2d 893 (1986); *Winchester* v. *Con-*

---

[3] Illinois abrogated the common law distinction between licensees and invitees by a statute that took effect in 1984. Illinois Stat. Ann. c. 80, para. 302 (Smith-Hurd 1987) provides: "The distinction under the common law between invitees and licensees as to the duty owed by an owner or occupier of any premises to such entrants is abolished. The duty owed to such entrants is that of reasonable care under the circumstances regarding the state of the premises or acts done or omitted on them."

Although there was a period during the 1960s and 1970s in which approximately fifteen state courts abolished or modified the distinctions in entrant status as a matter of common law, few states have done so by legislative action. See W. Keeton, D. Dobbs, R. Keeton & D. Owen, Torts (5th Ed. 1984) § 62, pp. 432–33. Commentators on torts have noted, moreover, that the judicial trend toward abrogating these distinctions seems essentially to have ended in the early 1980s. "[I]t appears that the courts are gaining a renewed appreciation for the considerations behind the traditional duty limitations toward trespassing adults, and that they are acquiring more generally a healthy skepticism toward invitations to jettison years of developed jurisprudence in favor of a beguiling legal panacea." Id., p. 434; but see *Hudson* v. *Gaitan,* 675 S.W.2d 699 (Tenn. 1984) (abolishing distinctions based on entrant status).

*necticut State Board of Labor Relations,* 175 Conn. 349, 361, 402 A.2d 332 (1978). The defendant conceded, at oral argument in this court, that the express terms of the statute do not encompass police officers, who under certain circumstances have legal authority to enter upon private property without the owner's consent or knowledge. We conclude, therefore, that § 52-557a does not abrogate the common law of Connecticut regarding the status of firefighters and police officers.

The plaintiff alternatively argues that the summons of the private alarm company "invited" him onto the property and thereby transformed his status. This contention cannot be reconciled with our observation in *Roberts* v. *Rosenblatt* that "[t]he status of the plaintiff was not dependent in any respect upon the identity of the person who sounded the alarm, be he an occupant or owner of the premises or a passerby." *Roberts* v. *Rosenblatt,* supra, 113. Other jurisdictions have similarly concluded that a police officer's status on private property should not depend on such fortuitous circumstances as the means by which he receives notice that his services are required. See, e.g., *Nared* v. *School District of Omaha,* supra, 380. Acceptance of the plaintiff's contention would lead to the anomalous result that two officers, each injured by the same defective condition on private property, would have different legal rights against the landowner if one officer had responded to a report of a burglar alarm while the second had decided to investigate on his own initiative after having observed something suspicious while walking a beat. We therefore conclude that the plaintiff's status as licensee was unaffected by the manner in which he came upon the defendant's premises.

Because the trial court correctly instructed the jury that the plaintiff could only recover from the defendant as a licensee, the plaintiff cannot prevail on his

appeal. The other issues that he has raised cannot stand in light of our disposition of the defendant's cross appeal.[4]

## II

The conclusion that the defendant owed the plaintiff only the duty she would owe to a licensee does not, of itself, wholly preclude liability for any injury the plaintiff may have suffered. The defendant maintains, nevertheless, in her cross appeal, that the facts adduced by the plaintiff in this case entitled her either to a directed verdict or to an affirmative response to her motion to set aside the verdict of the jury finding her liable to the plaintiff. We agree.

The duty that a landowner owes to a licensee does not ordinarily encompass the responsibility to keep the property in a reasonably safe condition, because the licensee must take the premises as he finds them. *Dougherty* v. *Graham,* 161 Conn. 248, 251, 287 A.2d 382 (1971). We have nevertheless recognized that under certain circumstances a heightened duty to the licensee can arise. *Laube* v. *Stevenson,* supra, 474. The Restatement (Second) of Torts, § 342, describes the duties owed to a licensee as follows: "A possessor of land is subject to liability for physical harm caused to licensees by a condition on the land if, but only if, (a) the possessor knows or has reason to know of the condition and should realize that it involves an unreasonable risk of harm to such licensees, and should expect that they will not discover or realize the danger, and (b) he

---

[4] In addition to his principal claim regarding his status on the property, the plaintiff also claims that the trial court improperly: (1) charged the jury on contributory and comparative negligence; and (2) denied the plaintiff's motion to set aside the verdict on the ground that the damages awarded were inadequate in light of the evidence of the plaintiff's injury. Our disposition of the issue of his status and of the defendant's cross appeal renders the plaintiff's remaining claims moot.

fails to exercise reasonable care to make the condition safe, or to warn the licensees of the condition and the risk involved, and (c) the licensees do not know or have reason to know of the condition and the risk involved." 2 Restatement (Second), Torts (1965) § 342, p. 210.

The plaintiff in this case conceded that the defendant did not have actual knowledge of the defective condition of the deck. He was therefore required to prove that the defendant had "reason to know" of the condition that caused his injury. To satisfy his burden of production on this element, he offered only the following evidence: (1) the defendant's admission that she owned the property in question; (2) testimony about the "rotted" appearance of the wooden deck offered by the plaintiff, a fellow officer, and a carpenter who inspected the deck about two months after the plaintiff's accident; and (3) testimony by the carpenter, who had not been qualified as an expert witness, to the effect that wood "takes years" to rot. The plaintiff contends that this evidence was sufficient to establish facts from which the jury could properly impute knowledge of the deck's dangerous condition to the defendant. We disagree.

To establish that the defendant in this case had "reason to know" of the defective condition of the deck, the plaintiff was required to proffer evidence that the defendant had factual information that would have led a person of reasonable intelligence to conclude that the deck's condition was dangerous. See 1 Restatement (Second), Torts (1965) § 12 (1), p. 19, and § 12, comment (a), p. 20.[5] The evidence actually introduced by the plaintiff, however, established only that the defend-

---

[5] The Restatement (Second) of Torts, § 12, provides the following definitions: "(1) The words 'reason to know' are used throughout the Restatement of this Subject to denote the fact that the actor has information from which a person of reasonable intelligence or of the superior intelligence

ant knew, at the time of the plaintiff's accident, that the deck was approximately seven years old and was made of wood, covered with a "stain." The plaintiff did not produce evidence that the defendant, who lived in Florida, had ever even seen the deck, had played any role in its installation, or had any knowledge that it was built of "untreated" wood. He produced no evidence tending to prove that wood generally rots in seven years, from which the jury might have inferred that a reasonable person would have reason to know that the deck had deteriorated. The plaintiff similarly failed to produce any evidence that any person acting on the defendant's behalf with regard to the property at issue had any actual or constructive knowledge of the condition of the deck, or that any person had ever given the defendant any notice, prior to the plaintiff's accident, that the deck was in poor condition. The record

of the actor would infer that the fact in question exists, or that such person would govern his conduct upon the assumption that such fact exists.

"(2) The words 'should know' are used throughout the Restatement of this Subject to denote the fact that a person of reasonable prudence and intelligence or of the superior intelligence of the actor would ascertain the fact in question in the performance of his duty to another, or would govern his conduct upon the assumption that such fact exists." 1 Restatement (Second), Torts (1965) § 12, pp. 19–20.

The comment to this section further elaborates the distinction between the phrases "reason to know" and "should know." "Both the expression 'reason to know' and 'should know' are used with respect to existent facts. These two phrases, however, differ in that 'reason to know' implies no duty of knowledge on the part of the actor whereas 'should know' implies that the actor owes another the duty of ascertaining the fact in question." Id., comment (a), p. 20.

The plaintiff contends, in response to the defendant's cross appeal, that the defendant would have known of the defective condition of the deck if she had exercised reasonable care. This contention confuses the factual basis required to establish "constructive knowledge" or a "reason to know" with the landowner's duty to inspect the property and to maintain it in a safe condition for invitees. Since we have held in Part I above that the plaintiff occupied the status of a licensee rather than that of an invitee, it follows that the defendant owed to him only the duty to warn of *known* dangers that is set forth in § 342 of the Restatement (Second) of Torts.

therefore fails to reveal any factual basis from which the jury could have reasonably concluded that the defendant knew or had reason to know that the deck's condition posed an unreasonable risk of harm to licensees such as the plaintiff. See 2 Restatement (Second), Torts (1965) § 342, p. 210.

Although directed verdicts are generally disfavored; *Sestito* v. *Groton,* 178 Conn. 520, 522, 423 A.2d 165 (1979); they are appropriate when the plaintiff has failed to produce any evidence of an essential element of his cause of action. See, e.g., *Teitelman* v. *Bloomstein,* 155 Conn. 653, 657-58, 236 A.2d 900 (1967). Since the plaintiff in this case failed to present any evidence that the defendant had actual or constructive knowledge of the dangerous condition of the deck, the trial court should have granted the defendant's motion for a directed verdict. We therefore reverse the judgment rendered on the jury's verdict.

Our disposition of the plaintiff's appeal and the defendant's cross appeal renders moot the appeal of the intervening plaintiff from the trial court's apportionment of the damage award. It is well settled that the existence of an actual controversy is an essential requisite to appellate jurisdiction. See, e.g., *Patterson* v. *Council on Probate Judicial Conduct,* 215 Conn. 553, 561-62, 577 A.2d 701 (1990); *Sobocinski* v. *Freedom of Information Commission,* 213 Conn. 126, 134-35, 566 A.2d 703 (1989); *Reynolds* v. *Vroom,* 130 Conn. 512, 515, 36 A.2d 22 (1944). It is not the province of appellate courts to decide moot questions when no practical relief can follow from their determination. *Patterson* v. *Council on Probate Judicial Conduct,* supra; *Sobocinski* v. *Freedom of Information Commission,* supra; *Reynolds* v. *Vroom,* supra; see also *Gormley* v. *Panuzio,* 166 Conn. 1, 3, 347 A.2d 78 (1974). We accordingly dismiss the appeal of the intervening plaintiff, the town of West Hartford.

The judgment is reversed and the case is remanded to the trial court with direction to render judgment for the defendant.

In this opinion the other justices concurred.