Juno N. **DINA,** Plaintiff,

v.

**CUDA & ASSOCIATES,** Defendant.

**Civil Action No. 3:12–cv–0523 (JCH).**

United States District Court, D. Connecticut.

June 13, 2013.

Joanne S. Faulkner, Law Offices of Joanne Faulkner, New Haven, CT, for Plaintiff.

Andrew J. Soltes, Jr., Law Offices of David W. Rubin, David W. Rubin, Stamford, CT, for Defendant.

## RULING RE: PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT (Doc. No. 41) AND DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. No. 53)

JANET C. HALL, District Judge.

## I. INTRODUCTION

Plaintiff Juno N. Dina ("Dina") brings this suit against defendant Cuda & Associates ("Cuda") for violations of the Federal Debt Collection Practices Act, 15 U.S.C. § 1692e ("FDCPA"), the Connecticut Creditor's Collection Practices Act, Conn. Gen.Stat. § 36a–648 ("CCPA"), and the Connecticut Unfair Trade Practices Act, Conn. Gen.Stat. § 42–110g ("CUTPA"). Dina's claims stem from Cuda's issuance of a bank execution to collect a judgment entered against Dina in small claims court.

Before the court is Dina's Motion for Partial Summary Judgment (Doc. No. 41) for a finding of liability and statutory damages as well as Cuda's Motion for Summary Judgment (Doc. No. 53) as to all three claims.

## II. STATEMENT OF FACTS

Cuda is a Connecticut limited liability company. Def. Local Rule ("L.R.") 56(a)(2) St. ¶ 1. Benjamin Morris ("Morris") was the managing member of Cuda for many years. *Id.* at ¶ 2. He was also an attorney admitted to practice in Connecticut and was the managing member of The Law Offices of Benjamin Morris, LLC. *Id.* Dina was the holder of personal credit cards from Chase Bank. *Id.* at ¶ 3.

Cuda is in the business of purchasing defaulted consumer debt and purchased Dina's credit card debt after they went into default. *Id.* at ¶¶ 3–4, 8. Cuda has over 1,000 collection lawsuits on file in Connecticut state courts and engages legal counsel to undertake collection efforts.[1] Pl. L.R. 56(a)(1) ¶¶ 5–7.

Cuda took Dina to Bridgeport Small Claims Court on her defaulted credit card debt. Def. 56(a)(2) St. ¶ 8. The claim number for the case was SCC–372134. *Id.* at ¶ 10. Dina claims that Cuda was represented in small claims court by Morris in his capacity as managing member of Cuda and not as an attorney with The Law Offices of Benjamin Morris, LLC. Pl. 56(a)(1) St. ¶ 9. Cuda denies this assertion, instead stating that Cuda was represented by The Law Offices of Benjamin Morris, LLC. Def. 56(a)(2) St. ¶ 9.

Default judgment in favor of Cuda entered against Dina on January 25, 2011, on one of the purchased Chase Bank credit card accounts (account number ending in 7133). *Id.* at ¶ 10. Donna Garamella, Vice President of Cuda, signed and submitted an Affidavit of Debt for the purposes of obtaining judgment. *Id.* at ¶ 11. According to Dina, she was never served in that action. Pl. 56(a)(1) St. ¶ 12. However, according to Cuda, Dina must have been served because the Superior Court would not have entered judgment against Dina had it not been satisfied that she was properly served and provided sufficient notice. Def. L.R. 56(a)(2) St. ¶ 12. Judgment and costs were awarded for $1,697.80. Pl. Mot. Summ. J., Ex. A.

On March 11, 2011, Cuda—either via Morris, himself, *see* Pl. 56(a)(2) St. ¶ 2, or the Law Offices of Benjamin Morris, LLC,

---

1. Dina states that Cuda "regularly collects or attempts to collect, indirectly, debts originally owed to Chase or other third parties." Pl. L.R. 56(a)(1) ¶ 7. Dina cites to Cuda's Answer (Doc. No. 37) to the Amended Complaint (Doc. No. 33), which states that, "Cuda engages outside legal counsel to undertake all collection efforts." Def. Answer at ¶ 9. Cuda denies Dina's 56(a)(1) Statement, but does not cite to evidence to support its denial.

*see* Def. 56(a)(1) St. ¶ 2—executed a Financial Institution Execution. The Connecticut State Court received the execution on March 22, 2011. Pl. 56(a)(2) St. ¶ 3. On March 31, 2011, the clerk granted and issued the Financial Institution Execution. *Id.* at ¶ 13. According to Dina, Cuda, acting through its managing member and attorney, Morris, forwarded the execution to a Marshal, Winthrop W. Fry ("Marshal Fry"), for service; Marshal Fry received it on April 5, 2011. Pl. 56(a)(1) St. ¶ 14. According to Cuda, the Law Offices of Benjamin Morris, LLC—not Morris personally—forwarded the bank execution to Marshal Fry for service. Def. 56(a)(2) St. ¶ 14. Marshal Fry returned the execution as wholly unsatisfied on June 12, 2011.[2] *Id.* at ¶ 15.

On July 5, 2011, Marshal Fry received the same execution for service on behalf of Cuda as judgment creditor as to Dina. *Id.* at ¶ 16; Marshal Fry Aff. 9 at ¶ 5. He again served the execution on plaintiff's bank on July 18, 2011. Def. 56(a)(2) St. at ¶ 17. The bank took a $100 processing fee out of plaintiff's account.[3] *Id.* at ¶ 18. However, Marshal Fry returned the execution unsatisfied to Cuda's attorney on September 28, 2011.[4] Pl. Mot. Summ. J., Ex. C, Fry Aff. 9 at ¶ 7.

Cuda, then, forwarded the same execution for service to Marshal Fry, Def. 56(a)(2) ¶ 21, however, Dina states that Cuda acted through its manager member and attorney, Morris, Pl. 56(a)(1) St. ¶ 21, whereas Cuda states that Cuda's lawyer, the Law Offices of Benjamin Morris, LLC, forwarded the bank execution. Def. 56(a)(2) ¶ 21. Marshal Fry received the bank execution on January 24, 2012 and served it on the same bank on January 27, 2012. *Id.* at ¶ 22. The bank again took a $100 processing fee out of plaintiff's account. *Id.* at ¶ 23. Dina claimed and was granted an exemption, but did not receive the $100 processing fee back. *Id.* at ¶ 24; Dina Aff. ¶ 10.

Default judgment in favor of Cuda entered on March 2, 2011, against plaintiff on another purchased Chase account. Def. 56(a)(2) St. ¶ 26. The claim number for this case was SCC–378501. Pl. 56(a)(1) St. at ¶ 27. According to plaintiff, Garamella signed and submitted an Affidavit of Debt dated December 9, 2010, which referenced the same underlying account number (account number 7133) and balance as the earlier small claims case, SCC–372134. *Id.* However, according to Dina, the SCC–378501 case involved a different account with a different balance.[5] *Id.* Again, Dina

---

2. The record does not include evidence regarding when Marshal Fry first served Bank of America with the execution.

3. Cuda states, as to paragraph 18, that it "does not have sufficient information to admit or deny this statement." Def. L.R. 56(a)(St. ¶ 18). "Such a response is not permitted under the Local Rules." *See Eiden v. McCarthy,* 531 F.Supp.2d 333, 338 (D.Conn.2008).

4. In Pl.'s L.R. 56(a)(1) Statement, Dina states that Marshal Fry returned the execution to Morris. Pl. 56(a)(1) St. ¶ 19. However, Marshal Fry states in his Affidavit that he returned the execution to Cuda's lawyer. Fry Aff. 9, at ¶ 7.

5. Cuda states in its 56(a)(2) Statement that, "[a]s to Paragraph 27 ... the affidavits do not provide any evidence that there were different accounts with different balance[s]." Def. 56(a)(2) St. at ¶ 27. Both small claims court filings reference the same account number (ending in 7133) and both enter judgment against Dina. Pl. Mot. Summ. J., Ex. A–B. The claims must have been intended to be for separate accounts, otherwise Cuda obtained two default judgments for the same debt.

During oral argument, Dina stated that the credit card records for charges to Zappos and Sony card, *see* Pl. Mot. Summ. J., Ex. A–B, were included in the small claims court files, evidencing that Cuda intended to seek judgment as to two different debts related to those two, separate accounts. However, during oral argument, Cuda argued that it improperly sought judgment on the same account—that ending in 7133—twice.

was not served in the case.[6] *Id.* at ¶ 28. Judgment and costs were awarded for $2,026.36. Pl. Mot. Summ. J., Ex. B.

Dina sued Marshal Fry in the United States District Court for the District of Connecticut for violating the FDCPA and CUTPA, based on Fry's failure to abide by Connecticut General Statute section 52–367b. Pl. 56(a)(2) ¶¶ 8–9. The action against Marshal Fry was settled by the parties. *Id.* at ¶ 10. As part of the settlement, Marshal Fry paid to Dina and/or her attorney the sum of $3,500 in full and final settlement of all claims. *Id.* at ¶ 11.

### III. STANDARD OF REVIEW

A motion for summary judgment "may properly be granted ... only where there is no genuine issue of material fact to be tried, and the facts as to which there is no such issue warrant judgment for the moving party as a matter of law." *In re Dana Corp.*, 574 F.3d 129, 151 (2d Cir.2009). Thus, the role of a district court in considering such a motion "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Id.* In making this determination, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. *See Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 274 (2d Cir.2009).

"[T]he moving party bears the burden of showing that he or she is entitled to summary judgment." *United Transp. Union v. Nat'l R.R. Passenger Corp.*, 588 F.3d 805, 809 (2d Cir.2009). Once the moving party has satisfied that burden, in order to defeat the motion, "the party opposing summary judgment ... must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.'" *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir.2009) (quoting Fed.R.Civ.P. 56(e)). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Beyer v. County of Nassau*, 524 F.3d 160, 163 (2d Cir.2008) (quoting *Guilbert v. Gardner*, 480 F.3d 140, 145 (2d Cir.2007)); *see also Havey v. Homebound Mortg., Inc.*, 547 F.3d 158, 163 (2d Cir.2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)) (stating that a non-moving party must point to more than a mere "scintilla" of evidence in order to defeat a motion for summary judgment).

### IV. DISCUSSION

#### A. *FDCPA*

■ Dina claims that Cuda engaged in "false, deceptive, or misleading representation[s] or means" to collect a debt, in violation of section 1692e[7] of the FDCPA, by failing to abide by the Connecticut state law requirements regarding bank executions. The FDCPA is aimed at eliminating the use of "abusive, deceptive, and unfair debt collection practices by ... debt collectors." 15 U.S.C. § 1692(a). The statute applies only to the actions of "debt collectors," which is defined in section 1692a(6) as "any person who uses any in-

---

**6.** Cuda states that it "does not have sufficient information to admit or deny this statement." Because this is not an acceptable response according to the Local Rules, the court will deem the statement admitted. *Eiden*, 531 F.Supp.2d at 338.

**7.** Dina alleges in her Amended Complaint that Cuda violated either section 1692d, e, or

f(1). Am. Compl. ¶ 28. Dina stated at oral argument that, because her Motion for Partial Summary Judgment seeking statutory damages only required her to prove one violation of the FDCPA, she only argued as to a violation of section 1692e. However, her claims pursuant to section 1692d and f(1) remain.

strumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." Furthermore, when referring to the collection of a "debt," the FDCPA defines debt as "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money ... which ... [is] the subject of the transaction ... [is] primarily for personal, family, or household purposes." 15 U.S.C. § 1692a(5). The FDCPA is remedial in nature and should be liberally construed. *Shrestha v. Nadel,* 2001 WL 286852, at *3 (D.Conn. Mar. 21, 2001).

As a preliminary matter, there is no doubt, based on the evidence, that Cuda is a "debt collector" as defined by the FDCPA. Although Cuda denied the statement that it "uses the means of interstate commerce in its direct collection efforts," Def. 56(a)(2) St. ¶ 6, it failed to cite to any evidence in the record to support the denial. Further, the evidence supports a finding that Cuda "regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(5). Cuda has over 1,000 collection lawsuits on file in Connecticut state courts. Def. 56(a)(2) St. ¶ 5. In addition, Marshal Fry stated that, as to at least five debtors, he received bank account executions on behalf of Cuda. Pl. Mot. Summ. J., Ex. C.

■ However, Cuda also attempts to argue that there is no evidence before the court which would allow a reasonable jury to determine that the judgment in question "arose out of a transaction entered primarily for personal, family, or household purposes." Def. Mem. in Opp. Mot. Summ. J., at 24. The court disagrees. Dina states in her Affidavit that she had credit cards in the past, which were all for personal

use, and that she never had a business credit card. Dina Aff. ¶¶ 1–2. Furthermore, the printout of the Chase card associated with account 7133 lists the following purchases: Stop & Shop, Hess, U-Haul, Tracey Nails, Burlington Coat Factory, and Dynasty Jewelry. Pl. Mot. Summ. J., Ex. B. Therefore, there is no genuine issue of material fact in dispute as to whether the debts which Cuda was attempting to collect were primarily for personal purposes.

That leads the court to consider (1) whether Cuda violated Section 52–367b of the Connecticut General Statutes; and (2) whether that violation constitutes a deceptive representation or means, in violation of the FDCPA. Section 52–367b of the Connecticut General Statutes states that, if a debt collector seeks an execution against any debt due from any financial institution to a judgment debtor, the collector "shall make application to the clerk of the court." Conn. Gen.Stat. § 52–367b(a, b). "If the papers are in order, the clerk shall issue such execution containing a direction that the officer serving such execution shall, within seven days from the receipt by the serving officer of such execution, make demand" on the financial institution. Conn. Gen.Stat. § 52–367b(b). The marshal may not serve "more than one financial institution execution per judgment debtor at a time," but, if the marshal receives confirmation from the financial institution that the judgment debtor has insufficient funds, the marshal may serve the same execution or a copy thereof upon "another financial institution" within 45 days of the marshal's original receipt of the execution. *Id.*

Dina argues that Cuda violated this statute when—after submitting a bank execution to the clerk of the court, sending it to Marshal Fry to serve on Bank of America, and receiving the returned execution un-

satisfied—it sent the same execution two more times to Marshal Fry to serve on Bank of America. Pl. Mem. in Supp. Mot. Summ. J. at 6–7. According to Dina, the 45 day period for service of the execution expired on May 20, 2010. *Id.* at 7. By re-sending the execution to Marshal Fry past that date, Dina argues that Cuda violated the statute. *Id.*

The court disagrees with Dina that, by re-sending the execution, Cuda failed to abide by the 45 day restriction—codified in section 52–367b—because that 45 day time frame applies to service of "the same execution or a copy thereof upon *another* financial institution," that is a financial institution other than the financial institution first served by the marshal. Conn. Gen. Stat. § 52–367b(b) (emphasis added). Cuda sent Marshal Fry the same bank execution three times for service upon the *same* financial institution. *See* Def. 56(a)(2) ¶ 22. Therefore, it cannot be said that Cuda violated the 45-day timeframe by having the marshal serve the same execution on one financial institution more than 45 days after the marshal first received it.

However, the court must look at the statute as a whole to determine whether Dina violated it by re-sending the same bank execution to Marshal Fry to serve on Bank of America. A district court interpreting a state statute must "predict how the forum state's highest court would decide the issues before [it], . . ., and, to the extent there is any ambiguity in the state statutes under consideration, to carefully predict how the highest court of the state would resolve the uncertainty or ambiguity." *Sprint PCS L.P. v. Conn. Siting Council,* 222 F.3d 113, 115–16 (2d Cir. 2000) (citations and internal quotation marks omitted). Thus, this court will first turn to the principles of statutory interpretation utilized by the Connecticut Supreme

Court when interpreting Connecticut state statutes.

The Connecticut Supreme Court "will not ordinarily construe a statute whose meaning is plain and unambiguous." *City of W. Haven v. Hartford Ins. Co.,* 221 Conn. 149, 156, 602 A.2d 988 (1992) (citations omitted). This is because, "[o]rdinarily, 'when the language of a statute is plain and unambiguous, we need look no further than the words themselves because we assume that the language expresses the legislature's intent." *Conn. Light & Power Co. v. Tex.-Ohio Power, Inc.,* 243 Conn. 635, 656, 708 A.2d 202 (1998) (citations omitted). "In the absence of ambiguity, the intent of the legislature is to be found not in what it meant to say but in what it did say." *Furstein v. Hill,* 218 Conn. 610, 622, 590 A.2d 939 (1991) (citations omitted); *see also* Conn. Gen.Stat. § 1–2z ("The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered."). "Where there is ambiguity in the statute, however, we ascertain the actual intent by looking to the language of the statute itself, its legislative history, the circumstances surrounding its enactment and its purpose." *Winchester Woods Assocs. v. Planning & Zoning Comm'n,* 219 Conn. 303, 310, 592 A.2d 953 (1991) (citations omitted); *see also Cordero v. Univ. of Conn. Health Ctr.,* 308 Conn. 215, 225 (2013) ("If an examination of the text of the applicable statute and related statutes yields an ambiguity, we may resort to extratextual sources, such as the legislative history and circumstances surrounding the statute's enactment, the legislative policy it

was designed to implement and its relationship to common-law principles governing the same general subject matter.").

■ The Connecticut Supreme Court therefore looks "first to the language of the statute ... which must be read in the context of the underlying statutory scheme." *Fyber Props. Killingworth Ltd. P'ship v. Shanoff,* 228 Conn. 476, 482, 636 A.2d 834 (1994) (citations omitted). "The words of a statute are to be given their commonly approved meaning unless a contrary intent is clearly expressed," *Oxford Tire Supply, Inc. v. Comm'r of Revenue Servs.,* 253 Conn. 683, 696, 755 A.2d 850 (2000) (citation and internal quotation marks omitted), or "the context indicates that a different meaning was intended," *Stamford Ridgeway Assocs. v. Bd. of Representatives,* 214 Conn. 407, 425, 572 A.2d 951 (1990) (citation and internal quotation marks omitted). Section 1–1(a) of the Connecticut General Statutes specifically provides that, "[i]n the construction of the statutes, words and phrases shall be construed according to the commonly approved usage of the language; and technical words and phrases, and such as have acquired a peculiar and appropriate meaning in the law, shall be construed and understood accordingly." Additionally, the Connecticut Supreme Court will "consider the statute as a whole with a view toward reconciling its parts in order to obtain a sensible and rational overall interpretation." *Fruin v. Colonnade One at Old Greenwich Ltd. P'ship.,* 237 Conn. 123, 130, 676 A.2d 369 (1996) (citation and internal quotation marks omitted).

■ "When the relevant statutory text and the relationship of that text to other statutes do not reveal a meaning that is plain and unambiguous, our analysis is not limited, and we look to other factors relevant to determine the meaning of [the statute], including its legislative history, the circumstances surrounding its enactment and its purpose." *DaimlerChrysler Servs. N.A. v. Comm'r of Revenue Servs.,* 274 Conn. 196, 202, 875 A.2d 28. " 'These aids to legislative interpretation apply with equal force to amendatory acts which effectuate changes in existing statutes.' " *Rose v. Freedom of Info. Comm'n,* 221 Conn. 217, 227, 602 A.2d 1019 (1992) (citation omitted). Among these other aids, courts may examine the relevant legislative history and the statute's relationship to existing legislation, particularly existing statutes regarding the same general subject matter. *See State v. Velasco,* 253 Conn. 210, 221, 751 A.2d 800 (2000); *Burke v. Fleet Bank,* 252 Conn. 1, 21, 742 A.2d 293 (1999). In this context, the Connecticut Supreme Court has observed that " '[s]tatements of legislators often provide strong indication of legislative intent.' " *Lynn v. Haybuster Mfg., Inc.,* 226 Conn. 282, 292, 627 A.2d 1288 (1993) (citation omitted). Thus, "[s]tatements of purpose, committee reports, and floor debate are all legitimate sources of legislative intent." *Burge v. Town of Stonington,* 219 Conn. 581, 594, 594 A.2d 945 (1991) (citations omitted).

■ Using these tools, the court must consider the meaning of section 52–367b(b). The court finds that the statute is not ambiguous, and that, when read as a whole, its meaning in connection with the issues in this case is clear. The statute first states that a "plaintiff requesting the execution shall make application to the clerk of the court." Conn. Gen.Stat. § 52–367b(b). Only after applying to the court will the clerk issue "such execution" with a directive that the "officer serving *such execution* shall, within seven days from the receipt by the serving officer of *such execution,*" make demand upon a financial institution. *Id.* (emphasis added). Therefore, according to the statute, after a plaintiff seeks authorization from the clerk of the court to obtain an execution, "such execution" may be served on a financial

institution, but only within seven days of its receipt by the marshal.

The court reads this statute to mean that, once a marshal receives the execution and seven days pass, the execution issued by the clerk of the court can no longer be served and is no longer valid (with one exception discussed below). This conclusion follows from the fact that the statute explicitly states that the marshal *shall* serve "such execution" within seven days of receipt, *i.e.*, it shall serve within that time frame the execution issued by the clerk of the court and sent to the marshal.

Cuda argues that, once the clerk of the court issues the execution, the judgment creditor may re-send the execution to the marshal as many times as it wishes. According to Cuda, service is then proper so long as the judgment creditor re-sends it to the marshal, such that the marshal again "receives" it, and then serves the execution within seven days of that second or subsequent receipt. However, the court finds this interpretation perplexing because (1) "such execution" suggests a singular execution, and (2) later copies of the execution are not "such execution" as issued by the court, but rather, copies of the execution as repeatedly sent by the judgment creditor.

The court finds further support for its reading of the statute in the exception created by the statute. According to the statute, the marshal may only serve one financial institution at a time but, if the marshal receives confirmation from the institution on which it served the execution that the judgment debtor had insufficient funds, he has an additional period to serve the "same execution"—*i.e.*, the execution issued by the court and served on the first institution or a copy thereof—on another

institution. Conn. Gen.Stat. § 52–367b(b) ("After service of an execution on one financial institution, the serving officer shall not serve the same execution or a copy thereof upon another financial institution until receiving confirmation from the preceding financial institution that the judgment debtor had insufficient funds at the preceding financial institution available for collection to satisfy the execution, provided any such additional service is made not later than forty-five days from the receipt by the serving officer of such execution."). The statute carves out a limited exception by which that same execution remains valid—beyond the seven days from receipt by the marshal—but even that exception limits the time to 45 days from receipt of "such execution," again making clear there is one execution and thus one receipt thereof. This exception indicates that the legislature did not intend for the execution to remain valid indefinitely, as the defendant attempts to suggest.

The use of "the same execution" in this later subsection supports the conclusion that there is one execution, which must be served within seven days of receipt by the marshal. That this subsection also allows service of a copy—which language is not in the part of the subsection at issue in this case—strongly supports the conclusion that the legislature did not intend to permit a copy of "such execution" to be served on the first financial institution a second time.

Nothing in the language of the statute suggests that the legislature intended to create a loophole whereby a party may repeatedly re-send the same execution, for an indefinite period of time, to the same financial institution in the hopes that it could collect its debts.[8] Rather, it indi-

---

8. The court notes that Bank of America charged Dina a $100 processing fee at least two of the three times Marshal Fry served the same execution on the bank. Def. 56(a)(2) St.

¶¶ 18, 23. The legislature surely did not intend to subject debtors to repeated and bur-

cates that the "same execution" as issued by the court may only remain valid beyond the seven days of its receipt by the marshal if the debtor's account at the first institution has insufficient funds, and even then, the execution is no longer valid after 45 days from the marshal's initial receipt of "such execution."

Looking to the language of the statute, it is clear and unambiguous that Cuda's reading is in error. In light of the court's interpretation of the statute, the bank execution became invalid as to Bank of America seven days after Marshal Fry first received the execution. Cuda, therefore, twice sent an invalid execution to Marshal Fry to re-serve on Bank of America.

Although Cuda argues that the statute only directs the officer's behavior—here, Marshal Fry—and places no obligations on Cuda, *see* Def. Mem. in Opp. Mot. Summ. J. at 11 (stating that the statute "*does not* direct or govern the conduct of a [small claims court] plaintiff or plaintiff's counsel, but rather, exclusively directs and governs the conduct of the serving officer"), the court disagrees. The statute explicitly directs the small claims plaintiff—here, Cuda—to seek authorization first from the court for an execution.[9] Conn. Gen.Stat. § 52–367b(b) ("If execution is desired against any such debt, the plaintiff requesting the execution shall make applica-

tion to the clerk of the court."). By failing to seek authorization from the court and instead sending an invalid execution to Marshal Fry to serve on Bank of America, Cuda violated the statute.[10]

██ The next question before the court is whether sending an invalid execution to a serving officer constitutes a violation of section 1692e of the FDCPA. Section 1692e states that, "[a] debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt," and sets forth a non-exhaustive list of what may constitute such behavior, including: (1) "the false representation of the . . . legal status of any debt," 15 U.S.C. § 1692e(2)(A); (2) "the threat to take any action that cannot legally be taken or that is not intended to be taken," 15 U.S.C. § 1692e(5); (3) "[t]he use or distribution of any written communication which simulates or is falsely represented to be a document authorized, issued, or approved by any court . . . which creates a false impression as to its . . . authorization or approval," 15 U.S.C. § 1692e(9); and (4) "[t]he use of any false representation or deceptive means to collect or attempt to collect any debt," 15 U.S.C. § 1692e(10).

By re-sending an execution to a marshal to be invalidly served on a financial institution in order to collect the debt owed by

---

densome processing fees when it enacted its scheme for collecting small claims judgments.

9. Cuda argued at oral argument that it could not be held liable for sending the invalid execution because Dina did not allege in her Amended Complaint that Cuda was vicariously liable for the actions of its attorney, Benjamin Morris, LLC. Rather, according to Cuda, Dina alleged that Benjamin Morris himself, as Managing Member and Attorney for Cuda, sent the execution. The court does not agree with Cuda's creative interpretation of the Amended Complaint. Dina alleged that Cuda acted through its attorney, Benjamin Morris, when it sent the invalid execution. Am.

Compl. ¶ 15. Whether Benjamin Morris personally sent the execution or another partner or associate at the firm did, the allegation is sufficient to raise a claim that Cuda is liable for the actions of its attorney.

10. Furthermore, if the statute invalidates an execution after a certain time period, the ultimate question is whether, by sending an invalid execution to a marshal to serve on a financial institution, Cuda used a false, deceptive, or misleading means in connection with the collection of Dina's debt. The ultimate question is not whether Cuda could be held personally liable for violating the Connecticut statute.

Dina, Cuda certainly used and distributed a written communication—the execution—which created a false impression as to its authorization or approval. 15 U.S.C. § 1692e(9). Further, it used a deceptive means to collect a debt, 15 U.S.C. § 1692e(10), because the means it used—the execution—was invalid.

Cuda argues that Dina has not introduced any evidence that *she* was misled by the defendant. Def. Mem. in Opp. Mot. Summ. J. at 18. Courts have conflicting views as to whether a misleading communication had to have been directed to the consumer or whether a misleading communication to a third party may form the basis of a claim under the FDCPA.[11] However, it is unnecessary for the court to delve deeply into this issue because Cuda not only sent a misleading communication: it used a "deceptive means" to collect a debt from Dina. Cuda sent the invalid execution to Bank of America so that Cuda could access money from Dina's account even though it had no authority to access such funds because the execution had expired. Such conduct is the essence of using a deceptive means to collect a debt. Therefore, the court concludes that Cuda violated section 1692e of the FDCPA, and Dina's Motion for Summary Judgment as to Dina's claim pursuant to the FDCPA is granted.

### B. *CCPA*

Dina brings a claim under the CCPA for the same conduct: Cuda's "unlawful[ ]

reissuing [of] an expired execution." Pl. Reply at 3. According to Dina, "[t]he CCPA contains parallel prohibitions [to the FDCPA] applicable to creditors such as Cuda." Pl. Mem. In Supp. Mot. Summ. J. at 9.

The CCPA states that, "[n]o creditor shall use any abusive, harassing, fraudulent, deceptive or misleading representation, device or *practice* to collect or attempt to collect any debt." Conn. Gen. Stat. § 36a–646 (emphasis added). The CCPA includes the same non-exhaustive list of activities which constitute fraudulent, deceptive or misleading practices as does the FDCPA. Regs. Conn. State Agencies § 36a–647–6. For a plaintiff to have a viable claim under the CCPA, she must present some evidence of harm because of the defendant's actions. *See Pratt v. University Accounting Services, LLC*, 2012 WL 4378051, at *5–6 (Conn.Super. Aug. 28, 2012); *see also* Conn. Gen. Stat. § 36a–648 (stating that a creditor is liable to a person who is harmed by abusive, harassing, fraudulent, deceptive, or misleading conduct).

Connecticut courts have stated that there exists only one critical distinction between the FDCPA and the CCPA: " "the act applies to debt collectors while the state statutes apply to creditors." " *Mosley v. Green Tree Servicing, LLC*, 2011 WL 2477685, at *2 (Conn.Super. May 23, 2011) (stating that there was another critical distinction—that the FDCPA pro-

---

**11.** In *Kropelnicki v. Siegel*, 290 F.3d 118 (2d Cir.2002), the Second Circuit stated that prohibited language (i.e., threatening or misleading language) is not a "false, deceptive, or misleading representation," under the FDCPA when it was sent to a third party and the consumer merely. read the letter containing the threat. *Id.* at 130. Relying on *Kropelnicki*, the Southern District of New York held that, to the extent the plaintiff alleged that the defendants "made misrepresentations to others, any such claim must . . . be rejected. For

a misrepresentation to be actionable under the FDCPA, the false statement must be made to the debtor directly." *Okyere v. Palisades Collection, LLC*, —— F.Supp.2d ——, ——, 2013 WL 1173992, at *10 (S.D.N.Y. Mar. 22, 2013); *see also Schuh v. Druckman & Sinel, LLP*, 751 F.Supp.2d 542, 548 (S.D.N.Y.2010) .(stating that, "the plaintiff 'must first show that the [communication conveying information about the debt] was a communication *to her*'—that is, a communication to the debtor herself").

vided for a private action whereas the CCPA did not—but that a 2007 amendment got rid of that distinction). Because the CCPA mirrors the FDCPA in all other regards, the court concludes that Dina's Motion for Summary Judgment as to her claim pursuant to the CCPA is granted.

### C. CUTPA

Dina claims that Cuda violated CUTPA by using the same affidavit, setting forth her outstanding debt, in both of her cases in state small claims court, even though the "underlying debts were substantially different in basis and amount."[12] Pl. Mem. in Supp. Mot. Summ. J. at 11. According to Dina, one affidavit had to have been false, which resulted in a judgment much greater than it should have been. Id.

■ The court need not spend much time on this claim because, as Cuda argues, it is barred by the common-law litigation privilege.[13] See Walsh v. Law Offices of Howard Lee Schiff, PC, 2012 WL 4372251, at *7 (D.Conn. Sept. 24, 2012).

" 'It is well settled that communications uttered or published in the course of judicial proceedings are absolutely privileged so long as they are in some way pertinent to the subject of the controversy ... The privilege applies also to statements made in pleadings or other documents prepared in connection with a court proceeding.' " Derisme v. Hunt Leibert Jacobson PC, 880 F.Supp.2d 311, 337 (D.Conn.2012) (quoting Alexandru v. Strong, 81 Conn.App. 68, 83, 837 A.2d 875 (2004)). "Although few courts have considered the litigation privilege in the context of CUTPA claims, those that have had occasion to do so have upheld the application of absolute immunity."[14] Walsh, 2012 WL 4372251, at *7 (citing SNET Information Servs. v. Vecchitto, 2007 WL 4212699, at *3 (Conn.Super.Ct.2007)) ("[T]he CUPTA claim is predicated on various representations by SNET regarding the amount of damages sought. It is undisputed that the representations uttered by the plaintiff were articulated during the course of a judicial proceeding. As those representations were essential to and published in the

**12.** Dina states while arguing her CUTPA claim that, "[f]iling a false affidavit resulting in a judgment greater than it should have been violates the FDCPA, and concomitantly violates CUTPA." Pl. Mem. in Supp. Mot. Summ. J. at 12. This is the first point at which Dina argues that this practice violates the FDCPA. Dina did not argue this claim when briefing Count One of the Amended Complaint nor does she cite any case law regarding how this practice constitutes a violation of the FDCPA. Therefore, the court will not consider whether either party is entitled to summary judgment as to a claim under the FDCPA for filing a false affidavit resulting in a judgment greater than it should have been.

**13.** Dina argues that Cuda waived its privilege defense because it did not plead it as an affirmative defense in its Answer. Pl. Reply. at 5. However, "absent prejudice to the plaintiff, a defendant may raise an affirmative defense in a motion for summary judgment for

the first time." Steinberg v. Columbia Pictures Indus., Inc., 663 F.Supp. 706, 715 (S.D.N.Y.1987); see also Astor Holdings, Inc. v. Roski, 325 F.Supp.2d 251, 261 (S.D.N.Y. 2003) (stating that the "Second Circuit has held that a district court may consider the merits of an affirmative defense—even one explicitly listed as such in Fed R. Civ. P. 8(c)—raised for the first time at the summary judgment stage, so long as the plaintiff has had an opportunity to respond") (citing Curry v. City of Syracuse, 316 F.3d 324, 330–31 (2d Cir.2003)). Cuda raised the defense of privilege in its Motion for Summary Judgment, to which Dina responded. See Pl. Reply at 5. Therefore, there is no prejudice.

**14.** Dina argues at length that the privilege does not apply to FDCPA claims. See Pl. Reply at 5–6. However, Dina did not argue that Cuda's submission of a false affidavit constituted a violation of the FDCPA, see supra, n. 11.

408

course of a judicial proceeding, they are protected by an absolute privilege.").

 Here, in both small claims court cases, Cuda filed an Affidavit of Debt for the purposes of obtaining judgment. Def. 56(a)(2) St. at ¶ 11, Pl. 56(a)(1) St. ¶ 27. Dina argues that one of those affidavits falsely set forth the relevant account number and outstanding debt owed Cuda. Such a false statement is clearly "pertinent to the subject of the controversy"—payment of the debt—and is, therefore, privileged. *Derisme*, 880 F.Supp.2d at 337; *see also Walsh*, 2012 WL 4372251, at *7 (finding that "alleged false communications … made by an attorney in the course of the underlying lawsuit on issues pertinent to the controversy … are protected by an absolute privilege"). Therefore, Cuda's Motion for Summary Judgment as to Dina's CUTPA claim is granted.

## V. CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Partial Summary Judgment (Doc. No. 41) is granted as to her claims for statutory damages pursuant to the FDCPA and CCPA. She is awarded $2,000 in statutory damages, $1,000 for her FDCPA claim and $1,000 for her CCPA claim.[15] 15 U.S.C. § 1692k(a)(2)(A) (stating that, "in the case of any action by an individual, [a debt collector is liable in an amount equal to] such additional damages as the court may allow, but not exceeding $1,000"); Conn. Gen.Stat. 36a–648 (stating that a debt collector who violates the act is liable to an individual for "such additional damages as the court may award, not to exceed one thousand dollars").

15. Cuda argues that Dina cannot collect statutory damages from Cuda because Dina already received a settlement from Marshal Fry. Def. Mem. in Opp. Mot. Summ. J. at 4. First, Dina did not assert a CCPA claim against Marshal Fry; therefore, the damages recovered from Marshal Fry bear no relationship to

Defendant's Motion for Summary Judgment (Doc. No. 53) is granted as to Dina's CUTPA claim.

**SO ORDERED.**

Dina's CCPA claim. Pl. L.R. 56(a)(1) St. ¶ 9. Further, there is no evidence before the court as to what the $3,500 settlement covered. Therefore, the court does not agree that the Fry settlement bars Dina from collecting against Cuda.